117 Cal.Rptr.2d 738 (2002)
96 Cal.App.4th Supp. 1
The PEOPLE, Plaintiff and Respondent,
v.
James Nathaniel BROWN, Defendant and Appellant.
No. BR 39863.
Appellate Division, Superior Court, Los Angeles County.
December 19, 2001.
*742 Law Office of Milton C. Grimes, Milton C. Grimes, Newport Beach, and William J. Kopeny, Irvine, Attorneys at Law, for defendant and appellant.
Rockard J. Delgadillo, Los Angeles City Attorney, Debbie Lew, Assistant City Attorney and Sunnie Lee Daniels, Deputy City Attorney, for plaintiff and respondent.

OPINION AND JUDGMENT
LEE, J.
On July 1, 1999, appellant was charged in a misdemeanor complaint with violating Penal Code[1] sections 422 (terrorist threatcount I) and 594, subdivision (a)(vandalismcount II). Appellant pled not guilty to both charges.
After a jury trial lasting approximately three weeks, the jury acquitted appellant of the terrorist threat charge, but convicted him of vandalism. Appellant was thereafter initially sentenced to three years' *743 summary probation under various terms and conditions, including completing a 12-month batterer's counseling program and paying $1,500 to a battered women's shelter. Appellant rejected the terms of probation, however, and was then sentenced to six months in jail and a restitution fine of $100. Appellant's driver's license was also suspended for one year. This appeal timely followed.
Appellant makes the following contentions on appeal: (1) the trial court erred in admitting improper opinion evidence from police witnesses who testified that appellant's wife's statements about appellant made before trial, which were recanted at trial, were "credible," "the truth," or "not a lie"; (2) the trial court erred in admitting improper expert evidence regarding battered woman syndrome without a proper foundation as to the prosecution expert's qualifications; (3) the trial judge violated section 1204.5 by improperly reading a police report, and this error occurred when it was impossible for appellant to object; (4) the trial court abused its discretion in initially imposing various unreasonable and unlawful probationary terms, including the requirement to pay a $1,500 fine to a battered women's shelter and to participate in domestic violence counseling; (5) the court erred in suspending appellant's driver's license for one year; and (6) the six months' custody sentence imposed by the court was an improper and illegal retaliation for appellant's rejection of probation. In order to analyze these contentions, we must first discuss in detail the trial and sentencing proceedings.

PROSECUTION'S CASE-IN-CHIEF
Prior to the prosecution's first witness being called to the stand on August 31, 1999, the tape of Monique Brown's 911 telephone call on June 15, 1999, a transcript of the tape, and a computer printout that accompanied the tape, were received into evidence. The tape was played for the jury.

1. Fernando Montes De Oca.
The prosecution then called its first witness, Fernando Montes De Oca. He testified that he was an officer with the Los Angeles Police Department assigned to the Hollywood Division. He was on patrol with his partner, Officer Lauraine Arellano, on June 15, 1999, about 5:15 p.m., when he responded to a domestic violence call at 1851 Sunset Plaza Drive. He identified as exhibit 1 a printout of the dispatch information he was given over the police radio that day, which stated that they would see a woman (only the first name of Monique was provided) who would direct them to the location, and that the suspect, her husband, was armed with a shovel. The dispatch information also reported that there was a gun inside the location, the suspect had vandalized a car with the shovel, the "suspect threatened to kill" the woman, and that there was a "history of domestic violence."
The officers responded to 1825 Sunset Plaza Drive, where the dispatch had indicated the woman was waiting for them. As they drove up, the woman, Monique Brown (hereafter Monique), accompanied by a dog, came outside the gate of the residence to meet them. She appeared visibly upset, had obviously been crying, and was nervous and shaken. She told the officers that she and her husband, James Nathaniel Brown (hereafter appellant), had become involved in a verbal dispute about the latter's infidelity. The argument took place in their bedroom and became very heated. As she was about to leave, appellant told her that he was going to kill her by snapping her neck. She stated that she then left the house and went to their garage. Appellant followed her into the *744 garage. He picked up a shovel and began to strike her vehicle. Afraid for her safety, Monique left and went to the neighbors located at 1825 Sunset Plaza Drive to call 911.
Montes De Oca stated that during the 15 to 20 minutes he spoke with Monique at the scene, she was upset, teary, and fearful, but very cooperative, rational, and coherent. Monique asked that the officers stand by while she went to retrieve some personal items of clothing. She stated she wanted to go back to New York.
Monique also recounted to the officers her history of domestic abuse with appellant, stating there had been prior domestic violence incidents involving physical confrontations during their two-year marriage that she had never reported to the police. The officer stated, over defense counsel's objection, that in his opinion, Monique was credible.
Montes De Oca stated that he asked Monique if there were any weapons in the house. She answered that a handgun was kept in a drawer next to the bed. She also stated that appellant had been drinking. The officer then informed Monique that the police could not simply stand by while she retrieved clothing, and that since a crime had been committed, they could not just leave. Upon being given this information, Monique did not change any part of her earlier statements to the police.
The officer stated that nine units showed up on this domestic violence call, which was customary given the nature of the call, namely, a domestic violence dispute with a gun and a threat to kill the victim reported in the broadcast. Montes De Oca stated he did not know the husband was Jim Brown, the celebrity, until about 15 minutes after he arrived.
Montes De Oca testified the officers devised a plan to call appellant and have him step outside his home, without anything in his hands, and walk up the driveway of his residence at 1851 Sunset Plaza Drive, at which time he would be taken into custody. When they made the telephone call, however, no one answered the telephone. Fearing a possible worst-case scenario, the officers stationed themselves outside the residence for a potential barricade situation. The lieutenant in charge at the scene, however, decided to simply go up to the front door and knock on it. A total of six officers went to the door, including Montes De Oca and his partner, Arellano.
Appellant answered the knock at the door. He was advised of the situation by the officers, told to turn around, and arrested. Appellant was very calm and cooperative. Montes De Oca and Arellano then went into the bedroom to locate and retrieve the gun. They located the gun where Monique had stated, namely, inside the drawer, and it was loaded, with one round in the chamber. Next to the gun were two knives and a box of ammunition.
Montes De Oca also testified that he observed Monique's car that evening. He stated it was a white Honda, located in the garage, and all the windows were "busted out." There were also dents all over the vehicle. Next to the car on the floor of the garage was a shovel. He then identified for the jury the shovel that he had seen that night in the garage. He also identified a photograph of the car's license plate, as well as several photographs showing the damage to the car. All the foregoing items were received into evidence. Montes De Oca stated that he did verify that evening that the car belonged to Monique, through a Department of Motor Vehicles printout reflecting the owner as Latifa Gunthrop, which was Monique's maiden name.
On cross-examination, Montes De Oca testified that Monique told him that appellant *745 never swung, or threatened to swing, the shovel at her. He also acknowledged that Monique did not want to sign a complaint that day against appellant, and that appellant was arrested for a felony. When shown a photograph of the car taken on the day of the incident, the officer acknowledged that the front window was not broken.

2. Jerry Janecek.
The prosecution's next witness was Los Angeles Police Officer Jerry Janecek, who was assigned to Hollywood patrol. His unit had responded to the scene as a backup. He stated that there was nothing in the dispatch information to indicate the suspect was Jim Brown. When he arrived, he saw Officers Montes De Oca and Arellano talking with Monique. He observed that she appeared visibly upset, had red eyes, and had been crying. Janecek and his partner also questioned Monique, asking her standard questions used in domestic dispute cases. In answering their questions, Monique was quiet, cooperative, and rational. While other officers went down to appellant's residence, Janecek remained with Monique. The distance from where he and Monique were located, 1825 Sunset Plaza, to appellant's home, 1851 Sunset Plaza, was 50 or 60 yards; there were four houses between them. The residence at 1851 Sunset Plaza is not visible from 1825 Sunset Plaza.
Janecek heard the lieutenant ask Monique if she would feel more comfortable sitting in the police car. She answered yes and got into the backseat of the police car with her dog, while Janecek sat in the front seat. Monique was never forced into the car; she was given the option to get in the car for her comfort. They remained in the car for at least 30 or 40 minutes. At no time in the car did Monique ever state she wanted to go back into the house or that the incident never happened. When she asked the officer what he thought would happen, he responded that appellant would be taken into custody, taken to the station, and questioned. She nodded her head affirmatively when given this information. While in the car, they could not see anything that was going on at 1851 Sunset Plaza.
Janecek saw several officers returning from 1851 Sunset Plaza, including his partner. The latter informed him that they were going to take the victim to the station, which they did in their patrol car. Monique agreed to go and was cooperative; she did not try to get back into the house. As they drove to the station, Monique was laughing and playing with her dog. The officers allowed Monique to take her dog, because she stated this would make her feel more comfortable.
When they arrived at the station, Monique and the dog were taken into the captain's office. The captain was on vacation at the time, and his office was the only place big enough for Monique and the dog. Detective Brian Gasparian came in and began to interview Monique. Monique cried periodically and answered his questions quietly and in a cooperative manner. Janecek was in and out of the office, sometimes getting water for Monique and her dog, another time getting tissues after Monique began to cry. Janecek's job was to take care of the dog. While he was in the office, he observed Monique answering questions freely and cooperatively.
When she told Gasparian about prior incidents of violence, she would cry periodically, but she did not appear reluctant to discuss these matters. After the interview was concluded, Janecek went to get an emergency protective order for Monique, a customary police procedure in a domestic violence call. Although the officer stated that the emergency protective order was *746 not mandatory, he felt that it was necessary in light of appellant's threat to kill his wife. Monique was then taken back to her house. The officer stated when the subject of a shelter or some other place to go came up, Monique stated she had only one place to go.
The officers took Monique back to her house and stood by while she packed up a few things to take to a hotel. While she was packing her things, the officers talked with appellant's daughter. After Monique finished, she got her keys to the white Honda and put her things into the car. She then got into the car and drove away. The officers followed her down to Sunset. They did not know which hotel Monique was going to.
On cross-examination, Janecek stated that he did not see any officer at the scene take out his gun and ask Monique if that was what appellant's gun looked like. He stated that while he was with her, she never asked to use the phone to call appellant's house or indicated she wanted to go back into the house. Janecek testified that the officers did ask her if she wanted to go to the station and answer a few questions for the detectives, and they obtained her permission to do so. He also testified that Monique stated she was going to go to a hotel, and she did not say she planned to go to a girlfriend's or friend's house. On redirect, Janecek stated that from the time of his arrival to the time he took her to the station, he was with Monique the entire time.

3. Lauraine Arellano.
The next witness for the prosecution was Officer Lauraine Arellano. She stated that her unit was the first to respond to the dispatch call. When it arrived, she observed Monique standing outside a gate at 1825 Sunset Plaza Drive, along with a dog and an Asian man. Monique appeared frightened and her eyes were watery, as if she had been crying. Although she seemed nervous and shaken, Monique was not reluctant to talk with the officers. She told them that she and appellant were arguing about the latter's infidelity, and appellant threatened to kill her by snapping her neck. She became afraid and left the house, but as she went out the door, appellant followed her. He picked up a shovel and began hitting her car. When asked by Arellano's partner whether there were any prior incidents of domestic violence, she said yes, but this was the first time she called the police. She told the officers she wanted to get her items and leave the house, because "she wanted to leave him."
During this time period, Monique appeared scared, frightened, and nervous. She stated she had been married to appellant for two years. Although she appeared upset, Monique was at all times rational, coherent, and cooperative. She did not appear reluctant or hesitant to tell the officers what had happened. Monique told the officers that appellant had been drinking, and that he had been drinking a lot recently due to the death of a friend.
On cross-examination, Arellano testified that Monique stated the gun inside their home was similar to the one the officers were wearing. Arellano quoted Monique as stating that "[h]e threatened to kill me by snapping my neck." The officer stated she did not tell Monique that people who make false 911 calls get into trouble, or that she could be punished or convicted of a crime for not telling about the threat. The officer stated that Monique told them that she was by the car when appellant began hitting it.
On redirect, Arellano stated that she had interviewed hundreds of victims or witnesses in her job, including hundreds of domestic violence victims. Based on her experience and observation, the officer believed *747 Monique was coherent, rational, and consistent in her statements. On recross-examination, appellant's counsel asked several questions regarding Arellano's ability to judge a person's state of mind, finally asking, "When you catch people in a lie, do they ever become frightened?" Arellano answered, "Yes."
On re-direct, the prosecutor asked Arellano, "Based on your experience and observations, in your opinion, was Ms. Brown lying?" Appellant's counsel objected on the grounds of speculation, and the prosecutor responded, "Defense opened the door with the last question, your honor." The court overruled the objection. When asked by the witness to restate the question, the prosecutor asked, "Based on your experience as an officer and based on your observations of Ms. Brown on June 15, in your opinion, was Ms. Brown telling you the truth or was she lying about what happened?" Appellant's counsel's objection on the grounds of competency was overruled. Arellano answered, "Yes, I did believe she was telling the truth," and was not lying.

4. Luis Lopez.
The next witness for respondent was Luis Lopez, an investigator with the domestic violence unit in the City Attorney's Office. He identified videotape made at the scene of the incident that depicted the locations of the various houses, as well as the general layout of the property.

5. Michael Albanese.
Lieutenant Michael Albanese was the next witness for the prosecution. He stated that on the day in question, he received a call from a field sergeant stating that officers had responded to a domestic violence call involving appellant and his wife. It was standing procedure that when an event was noteworthy or involved media implications, the watch commander was to be informed. He went to the scene to ensure that the police were in compliance with protocols relative to domestic violence investigations, with an understanding that the media might become involved due to appellant's celebrity.
After he arrived, he talked to Monique. Her demeanor was "controlled upset," anxious, and cooperative. After talking with Monique, he considered various options on how to proceed. The first was to contact appellant over the telephone. If that did not work, several officers would go to the house and knock on the door. If that failed, then the officers would simply leave, since the victim was now safe and out of the house.
When no one answered the telephone, officers went to the house, while Albanese watched from a distance. He observed appellant being taken into custody. He acknowledged during cross-examination that Monique stated the gun was kept in the house for the couple's defense, that appellant had not threatened her with the gun, and that she did not want appellant arrested.

6. Monique Brown.
The prosecution called Monique as its next witness. She stated her true name was Latifa Monique Brown, and that her birth name was Latifa Monique Gunthrop. She testified that she had been married to appellant for two years. She was 23 years old when she married appellant, who was then 61 years old. Her occupation was Director of Operations for Ameri Can Program, Inc., as well as the Secretary/Treasurer for the Ameri Can Foundation for Social Change. Ameri-Can Program Inc., is a corporation solely owned by appellant. Ameri Can's office is in their home at 1851 Sunset Plaza Drive. Since her marriage, appellant provided for Monique financially, *748 which included a monthly salary working for Ameri-Can. She was in her third year at Santa Monica Community College.
She stated that on June 15, 1999, she made a 911 call from a neighbor's house located at 1825 Sunset Plaza Drive. She did not recall the neighbor's name, in that this was the first time they had met. She stated that she told the 911 operator her husband was inside the house and had broken the car windows with a shovel. She said she told the operator that she had not been hit. She remembered telling the operator to "[p]lease be respectful. There is no danger there. I am fine." She claimed she made this statement at the end of the call. When asked if it would refresh her recollection if the prosecutor played the tape, she replied, "No, it would not because it's not on the tape." Shortly thereafter, however, she stated this language was on that portion of the tape that the transcript labeled "inaudible." She stated that although she felt free to answer the telephone operator's questions, the operator was leading her and "the tone was being set." Monique testified that immediately after she completed the 911 call, she called her home to speak with appellant, but no one answered.
Monique stated that she had an argument with appellant that day because she suspected him of having an affair. The matter had been building up for six months, and she confronted him. When asked by the prosecutor if she told Detective Gasparian that the argument was also about her inviting a male friend from school named Jack to stay in the residence and problems had been brewing for a few days, Monique stated that she did not recall. She did say that she invited Jack, a friend from Ohio, to spend a weekend in the house because he needed to take a test at the police academy that weekend. Monique stated she thought that she did tell Gasparian that the actual argument started on June 13, 1999, over Jack's staying the weekend, but she had also said the incident had been building up since appellant's best friend, George Hughley, died in February. She told Gasparian that appellant had been withdrawn, depressed, crying, and drinking. She stated that she did not tell Gasparian that appellant had tried to start a fight with her that morning over Jack's staying at the house.
Monique testified that she had an argument with appellant on June 13, 1999, when she returned from rollerblading at Venice Beach with Jack. When she returned, she found appellant in bed crying. Appellant was angry, not because she had been rollerblading with Jack, but because she had left the house in the middle of their argument, which he deemed disrespectful. She stated that she did not tell Gasparian that appellant had thrown things or broken things, or that appellant had grabbed a cane and began beating the bed with the cane. When asked later if she had told Gasparian that appellant became angry in the argument and took the cane and began beating the bed, she acknowledged that she had said "something to that effect, but I don't remember exactly." Although he was beating the bed with the cane yelling at her, it did not scare her. She stated that although she told the detective that it scared her and appellant was yelling, "[H]ow dare you bring another man into the house," such statements were not true.
She had testified that she did not remember telling Gasparian that appellant told her that he had to pray to God so he would not kill her and Jack, but she remembered saying something to the effect that he said he had to pray to find peace "because of the things I had been coming at him with." She did admit telling Gasparian that appellant had told her that he *749 had to drink to pass out so he could avoid killing her and Jack, but this statement to Gasparian was not true. Although appellant had been drinking that day, she had never seen him drink except socially, until this one incident. Monique stated appellant had to drink "to find peace to calm his mind because I had been coming at him with all these crazy accusations...."
She acknowledged that appellant did tell her on the evening of June 13 that the marriage was over. She did not recall if appellant told her to go back to Buffalo. She stated her only blood relative in Los Angeles was a 12-year-old niece. Monique testified that although she stayed at a hotel that night, she did not have to.
She stated that she returned from the hotel on June 14, 1999. Later that day she told appellant that she had reserved a flight to Buffalo. He responded that she did not have to go, and she spent the night at the house. The next day, however, on Tuesday, June 15, she told appellant that she was not going to take it anymore and the marriage was over. She felt that appellant was having an affair, while appellant felt that it was disrespectful to have another man in the house. She felt, however, that Jack was just a "scapegoat" and an "excuse."
She then testified that the argument was really about appellant's plan to go to Miami, which is where she thought the other woman was. This was the final straw, according to Monique, because she thought he had been carrying on a relationship with this woman for six months. She stated that although appellant had been drinking on June 13, he was not drinking on the June 15. Appellant was on the bed in the bedroom watching television, and during the argument his emotional demeanor was indifference; he was extremely passive.
She became very angry, and she called him names and yelled at him. Appellant shifted the conversation away from his alleged infidelity to Monique's rollerblading with Jack, which he felt was a sign of disrespect to appellant. Appellant continued to lie on the bed; he did not get angry and only slightly raised his voice. Monique told appellant, "[F]uck this, I'm not taking this shit," all in an effort to provoke some type of response. She told him that she was leaving. Appellant continued to watch television, so she picked up the remote and turned the set off.
Monique said that appellant never threatened to kill her by snapping her neck. Also, she stated she never went to her car; rather, she and her dog, Cruiser, walked up the driveway. About 30 to 40 seconds after she left the house, she heard the front door open, and she turned and saw appellant. He was yelling and appeared angry and upset. He yelled, "[W]hat the hell is wrong with you? Get out." He looked at Monique and said, "I'm going to break out these fucking car windows." Appellant went to the side entrance of the garage. Monique stated that she yelled at him, "[G]o ahead, you son of a bitch," and "it's your car, I don't give a shit, you're going to have to pay for it." She testified that the white Honda was not her car. She initially stated that she did see appellant breaking windows, but then immediately changed her testimony and asserted that she never saw him breaking windows. When shown the registration which listed her as the registered owner of the white Honda, she acknowledged that it did, in fact, list her as the registered owner.
Monique testified that she went immediately to a neighbor's house from the driveway. She knew to tell the 911 operator that appellant beat her car with a shovel because, as she was walking up the hill, she saw him reaching for the shovel. *750 Therefore, she assumed he used the shovel. She stated that the shovel was not inside the garage by the white Honda. When asked if she thought she had a choice when appellant told her he was going to break her "fucking windows," Monique stated that he never threatened to break out the windows of her car, and that she did not care if he broke out windows. She stated, "I gave him permission because any type of reaction, I felt, would get him to the level of where he would admit to his affair." Although appellant had come out of the house angry and yelling, and had threatened to break out the windows of the car, Monique was never afraid.
When asked if she told Officers Montes De Oca and Arellano that appellant followed her out to the garage and beat her car with a shovel, Monique answered, "Absolutely not." She did not recall if she told Gasparian if she had given appellant permission to beat her car. Although she did not see the windows being broken, she did hear the glass breaking as she went up the hill.
Monique stated that although she told the 911 operator there was a history of domestic violence, she never made such a statement to Officers Montes De Oca and Arellano. She stated that in the past, although she and appellant had engaged in arguments, appellant never called her names, threatened her, thrown things, or broken things, except for this one incident. Monique stated that if he started a fight, he would afterwards apologize and admit he was wrong. In fact, he had apologized for losing his temper on June 15, 1999, and breaking the windows.
Testimony resumed after a lunch break. Monique stated that she did not tell Officers Montes De Oca or Arellano that appellant threatened to kill her by snapping her neck. She stated she did say this to Gasparian, and also told Gasparian that appellant had told her he would have snapped her neck, had he not previously promised to stop being physically abusive. Although she did recall telling Gasparian that there had been several prior instances of domestic violence, she did not recall saying there had been approximately seven such incidents in their two-year marriage. Any such statements, however, were not correct. She acknowledged that she told Gasparian that appellant had previously given her a black eye, choked her on another occasion, and in fact had an episode of domestic violence one month before the June 15 incident.
Monique told Gasparian that during the incident one month earlier, she threatened to leave appellant, because this threat would force him to "deal with" her regarding the alleged affair. She acknowledged that she told Gasparian that when she tried to leave appellant, he stood over her with a metal spear and asked her if she wanted to live. She also said that she told Gasparian that appellant told her if she ever took him to court, he would kill her or have her killed. She stated that these statements to Gasparian, however, were untrue. Monique testified that, in fact, there had never been any incidents of domestic violence.
She did acknowledge that there was one prior occasion where she left the house and went to a neighbor's and called a friend, "but not out of any fear." She stated that on that occasion she and appellant had argued about their business and how it should be run. When she got to the neighbor's house, she called George and Shirley Hughley, who came and took her to their home. She spent the night at the Hughley house and returned home after a day or so. The Hughleys acted like mediators between her and appellant.
*751 She acknowledged that she told Gasparian during the interview that she did not want appellant arrested, but she did not say she wanted to make a record of the incident in case something should happen to her. She did not tell Gasparian that in Buffalo, where she came from, women do not report on their husbands, or that she had done everything to make the marriage work.
Monique testified that after the Gasparian interview, she went back to the house, packed some clothes, and then drove to a local restaurant to make a telephone call to her husband. Afterwards, she drove back to the police station, because she realized that with the protective order she had, she could not go home. She wanted the protective order released so she could go home and be with her family. When asked if she, in fact, went to a friend's house that night, Monique responded, "[A]bsolutely false." She stated she saw appellant later that night at their home, where he appeared tired, embarrassed, and emotionally hurt. She stated appellant had never threatened her to drop the charges, tell the police she lied or what to say on the stand, or what to say at press conferences held at their home. She testified that she did not feel nervous about testifying with appellant watching her in the courtroom.
Monique was then cross-examined by appellant's counsel. She stated that the white Honda belonged to the corporation and was used to transport children, but because they did not want the company to become liable if there were any accidents, the car was transferred to her name. She identified a certificate of title showing the car was owned by the corporation in 1994. She stated that for insurance purposes title was transferred to her before she married appellant.
When asked why she told appellant he could break the windows on the car, she stated she was very frustrated and it was "like a dare." When he told her he intended to break the windows, she gave him permission. She stated that the money to repair the car came from the corporation. She stated she had been trying to provoke appellant the entire day of June 15, because he was not taking her seriously.
Because her yelling and telling him to break the windows had not worked, Monique stated that she felt desperate, hurt, and humiliated. She wanted appellant to feel the pain that she was feeling. She stated that she loved and respected her husband, but she would never let him abuse her.
Monique testified that she met her husband on a television show where she was doing some modeling. She became an employee of the Ameri-Can corporation. The Ameri-Can Education Program is a 15chapter life management skills curriculum that deals with the responsibility of self-determination. She acted as a facilitator or teacher of the Ameri-Can program while she was doing commercial modeling and working in a law firm as a legal secretary. Monique stated that while appellant provided the vision for Ameri-Can, she actually ran the corporation.
She stated that she was the person in the house who broke things. For months she had been confronting her husband about her suspicion of his infidelity, but she would back off periodically because of concerns about his grief for his friend. Appellant would ask her not to take advantage of his grieving. At one point Monique got angry when he left the house, and she threw glasses against the wall and broke a lamp. She also broke some other things in the bedroom. The incidents occurred probably a few weeks before the June 15 incident. Appellant was not present when she broke these items.
*752 Monique stated that she was never scared during their arguments, even though he was larger than she was, because he had never laid a hand on her and she had no reason to think he ever would. Around June 15, she was worried about appellant's infidelity so she mentioned Jack to "push his buttons," to upset and provoke him. She stated that she knew that going rollerblading with Jack on June 13 would upset appellant. When she heard on June 15 that he was going to Miami, she "just snapped."
Referencing events that transpired on June 15, Monique stated that after her argument with appellant in the bedroom, she left the house and walked out the front gate into the parking area. Appellant then spoke to Monique, and she saw appellant walk through the doorway and reach for the shovel, which was up against the wall. She then cursed at him again and started walking up the hill. She heard the glass breaking, but she did not hear the garage door close. She then went to the neighbor's house and called 911, because she was desperate. She needed help, someone to come out and mediate and to take her side. She thought that calling the police would hurt, embarrass, and humiliate appellant. She thought the police would come out and help her resolve her marital status.
Monique testified that she believed the telephone operator was not really helpful and cooperative, and that she put words in Monique's mouth, leading her on. When she was asked if appellant had hit her, she felt like she had to say something to get the police to come out and do something. Although she mentioned the gun in the house, she had never seen appellant use the gun against anyone. The reason she answered "not today" when asked if she had been struck was because she wanted the police to come out, so she went along. She gave the police false information, and she planned to straighten out the matter once they arrived. She told the operator that appellant beat "her" car, which was not true, out of emotion and a desire to get the police to come out.
She stated that before the officers arrived, she attempted to call appellant at their home, but no one answered the telephone. She felt bad, because she realized she had made a mistake in making the 911 call and permitting the operator to manipulate her into making false statements. When the officers arrived, she asked to call appellant, but they refused to allow her to make the call. She told the officers that "[t]his is bullshit. This is not about my husband or me. I don't understand why you're doing this. You're not listening to me." She said she did everything she could to tell the officers that the 911 call was false, telling them that she was not a victim and she had lied, but they neither listened nor let her call appellant. The officers belittled her, treating her with disrespect and contempt. Monique testified that the discussions with the officers were "very combative, very intimidating and scary." She told the police that she wanted to speak to the supervisor, because nobody was listening to her. At one point Monique began to return to her home, but she was physically restrained by Arellano. Some officers, however, treated her well.
Monique stated that, without asking if she consented, an officer led her by her arm to a squad car and placed her inside. Without anyone asking if she wished to go there, she was taken to the police station. At this point Monique felt that she was in custody, and she was simply relieved that her husband was still alive.
Monique testified again about her conversation with Gasparian. She stated that the officer initially was very friendly and sympathetic, but then his attitude changed *753 when she told him she had made a false 911 call. Gasparian became irritated and told her she could be facing charges. Gasparian then falsely told Monique that appellant was in another room at the station with his attorney, when appellant was actually there with another person. Gasparian told Monique that appellant was "bashing" and saying bad things about her, such as that she had been having an affair. At that point Monique decided that a divorce was imminent and she would go along with Gasparian and give him whatever information he needed. She thought appellant had already been charged, the matter was out of her hands, and what she was saying would benefit her in case of a divorce. She wanted to give the appearance that she was a victim of abuse and not have to admit she had made a false 911 call.
Monique acknowledged she told Gasparian that appellant had been physically and verbally abusive in the past, but this was not true. She also testified that she made the following statements to Gasparian that were untrue: appellant beat the bed with a cane; appellant said he had to drink to pass out so that he would not kill her and her friend; appellant said he had to pray to God not to kill her and Jack; appellant said he would have broken her neck, had he not promised to stop being physically abusive; she was afraid for her safety and ran away to call the police; appellant choked her in the past; appellant gave her a black eye; and appellant stood over her with a metal spear and asked her if she wanted to live.
The next day she went back to the police station for an interview with Detective McNeal. She told him it was "bullshit," that what she had done was wrong, but the detective was not interested, ignored her, and "blew her off."
After the Gasparian interview was concluded, the officers took Monique back to 1851 Sunset Plaza Drive. The police had obtained a protective order, and Monique wanted them to think she was going home to get a few things, because if she actually returned home to stay, she would go to jail for violating the order. She just threw some of her things into a bag, but her true intent was to stay home.
After she left and went to the local restaurant, she called the house and spoke with Duane Moody, a family friend who had been at the house. Moody and another person employed with the Ameri-Can program came down to the restaurant. Moody and Monique then went down to the police station. She wanted to tell the police that she wanted the protective order lifted. The officer there was unable to lift the order, but he told her if she went home, the protective order would not be used against her. She went back to her husband that day and has remained with him since.
On redirect, Monique stated that she told Gasparian that she gave appellant permission to strike her car. She stated that the first time she publicly stated she gave such permission was on Larry King Live on August 14, 1999, and before that she and appellant had held various press conferences in their home. When asked by the prosecutor if it was correct that she never mentioned allegedly giving appellant permission to strike her Honda on Geraldo Live on July 12, 1999, Monique answered "Yes, that's correct." She acknowledged that she had stated on that television show that one of the reasons she had acted as she had that day, was due to premenstrual syndrome (hereafter PMS). Her own counsel elicited further information on her PMS medical ailment, to the effect that she becomes more sensitive and emotional in this condition. She testified that she would take certain vitamins and stay away from certain foods to help this condition, *754 but she was not taking such steps on June 15.
At the end of the day's proceedings, the record reflects a discussion regarding appellant's objection to the prosecution's intended evidence on battered woman syndrome, to be introduced through Dr. Sandra Baca. The court overruled the objection at that time. Counsel next discussed possible evidence regarding certain sexual activity involving Monique, appellant, and a third person. The prosecution argued that this evidence was relevant, in that it showed the lengths to which Monique would go to please appellant, and that its probative value was great. The court stated it would have to balance the various facts and rule later. On the next day, the court stated it would allow the prosecution to present evidence that Monique told Gasparian that she engaged in "threesome" activity at appellant's request.

7. Brian Gasparian.
Brian Gasparian was called as the prosecution's next witness. He testified that on the day in question, he was the evening watch detective at the Hollywood station. When Monique arrived at the station, she and her dog were placed in the captain's office, which was a nice office with nice furniture. It was not customary for a witness to be permitted to have his or her dog with them for an interview, but it was allowed in this instance. When Gasparian went into the captain's office, Monique and her dog were there, along with Officers Devey and Janecek.
Gasparian told Monique he was there to talk with her about the case. She inquired whether appellant was going to be arrested. Gasparian responded that he was unsure, but he would talk with her, appellant, and the officers, and then make some type of decision. Monique stated that she did not want appellant to be arrested, but she did want to make a report to document what had transpired, in case something happened in the future. According to Gasparian, Monique was upset and nervous, but very cooperative.
Gasparian stated that Monique gave him a chronology of the relevant events. She stated that she and appellant had argued because she had brought Jack, a male friend from college, to the house. Appellant thought that it was disrespectful for her to do this. The argument had begun on June 13, 1999. To avoid the argument, she and Jack went rollerblading. When she returned several hours later, appellant was on the bed upstairs crying about her having Jack in the house. Appellant began beating the bed with a cane and told her that he had to drink to pass out to avoid killing them both, and that he had to pray for strength to avoid killing them. Monique said she then went to a hotel and spent the night there.
The next day, she informed appellant that she had made arrangements to go back to Buffalo, and he told her she did not have to. Monique stayed at the house that night. On the next day, June 15, 1999, the argument about Jack being in the house began anew. She accused appellant of having an affair. Appellant told her that if he had not made a prior promise to not be physically abusive, he would have broken her neck. Appellant then got a shovel and began hitting her car. Monique ran out and called 911.
Monique never complained about any officers or treatment she received. She never said that she was forced into the police car or gave appellant permission to break the windows on her car. She never stated that she felt intimidated by the officers, that the 911 operator led her, or that none of this happened. Although she *755 seemed upset and nervous, she appeared comfortable, talkative, and open.
During Monique's interview with Gasparian, she informed him that there was a history of domestic violence in her two-year marriage to appellant, namely, approximately seven incidents of abuse. Gasparian testified that Monique stated that appellant had previously on one occasion given her a black eye, on another choked her, and approximately a month before stood over her with a metal spear and asked her if she wanted to live. She also stated that appellant had told her that if she ever took him to court, he would kill her or have her killed.
Monique told Gasparian that she worked hard at the marriage and that she loved appellant. While discussing the details of their marriage, Monique stated that on an occasion, appellant had brought home another woman for them to engage in threesome-type sexual activities. She gave this as an example of her efforts to make the marriage work. Gasparian stated that he never told Monique that she might be in trouble or could be in trouble for making a false 911 call.
On cross-examination, Gasparian testified that over the years he had developed ways of talking to different people during interviews. However, he had never threatened a victim with consequences of failure to cooperate in trying to "pull something out of a witness. In addition, Gasparian testified that he did not get the specific details to any of the seven alleged domestic violence acts against Monique by appellant.
On redirect, Gasparian clarified his testimony regarding different types of interviewees. He stated that there are two types, one where you have to coax information out of him and another where the witness is talkative and the officer merely clarifies and guides the interview to relevant facts. Monique's interview was the latter type, and during their interview Gasparian generally just took notes and ascertained time frames to avoid confusion.
The prosecutor asked Gasparian if he felt, based on his experience and training, he could assess the credibility of witnesses, and whether he believed Monique on the occasion of the interview. Gasparian answered both questions in the affirmative. Appellant's counsel did not object to either of these questions. On recross-examination, appellant's counsel returned to this issue, as reflected in the following exchange:
"[Mr. Graysen, appellant's counsel] When you say you believed Mrs. Brown on June 15, that was your opinion; isn't that correct?
"[Gasparian] It was an opinion, yes.
"Q. You don't have any special powers that we don't have which enable you to tell, ultimately, if someone is telling the truth, do you?
"A. No, I don't.
"Q. So we shouldn't be calling you Super Detective Gasparian?
"A. No
"Q. Okay.
"A. Absolutely not."

8. Dennis McNeal.
Los Angeles Police Detective Dennis McNeal was the next prosecution witness. He stated that he was a detective with the Los Angeles Police Department, and he answered questions regarding events on June 16, the day after the incident. He testified that on the morning of June 16, Monique arrived at 7:00 a.m. at the Hollywood police station. She was adamant in directing McNeal to drop the charges against appellant and to remove the protective order. She told him that she and *756 appellant had reconciled, she did not want appellant to go to jail, and that on June 15, appellant had told her that if he was not in the proper frame of mind, he would snap her neck, but that appellant did not threaten to kill her. When asked about the prior incidents of domestic violence, Monique explained that she and appellant would sometimes physically push each other. Other than indicated above, Monique did not contradict any of the statements that she had made the previous day, nor did she say that she gave appellant permission to hit her car with a shovel.

9. Sandra Baca.
Dr. Sandra Baca was the next witness for the prosecution. Immediately prior to Dr. Baca's taking the stand, appellant did not object that she was not qualified to testify as an expert, or offer any other objections to her testimony.
Dr. Baca testified that she was a clinical director of the About Face Domestic Violence Intervention Project. As the clinical director, her responsibilities included conducting individual and group therapy, supervising and training a staff of 15 people, and writing reports to the court. About Face was formed in 1986 and, among other things, provided services for perpetrators and victims of domestic violence, and their children. Dr. Baca stated that she came in direct contact with approximately 250 victims of domestic violence annually.
As for her educational background, Dr. Baca testified that she had a doctorate in psychology with a focus on family psychology and individual psychology. As regards her domestic violence experience, besides writing her doctoral dissertation on a family that suffered from domestic violence, she was in the process of conducting research that entailed administering a personality test on battered women and comparing their profiles. In addition, Dr. Baca was involved with four organizations related to domestic violence, including the Los Angeles Domestic Violence Council and California Alliance of Domestic Violence, and had trained police detectives on investigating reports of domestic violence. She stated she had testified in court for both the prosecution and defense in over 100 cases.
Dr. Baca discussed the "cycle of violence" associated with battered woman syndrome and the common behavioral characteristics of victims experiencing the syndrome. This cycle consists of three phases: (1) tension phasecommon stress; (2) acute batteryemotional and physical abuse; and (3) honeymoon/contritionrelationship is once again fixed and victim decides to remain in the relationship. The cycle then repeats itself over and over, with the abusive period becoming longer and longer, as well as increasing in severity, and the honeymoon period shorter and shorter. After explaining this phenomenon, Dr. Baca testified that in her experience, she has witnessed a battered woman minimize and even recant a version of events in order to help her cope with the abusive relationship. When this happens, she stated it is common for a victim of spousal abuse to protect the abuser by completely denying the incident and being reluctant to testify in court.
On cross-examination, Dr. Baca testified that although she was a licensed marriage and family counselor, she was not a licensed clinical psychologist. She stated that had taken the written exam as the first step to become licensed as a clinical psychologist, but she did not pass.
Appellant's counsel made only a few objections during Dr. Baca's testimony. When asked by the prosecutor whether, based on her training and experience, she had been able to determine certain characteristics of victims as a class with regard *757 to domestic violence, appellant objected on the grounds of foundation. This objection was overruled. The next objection occurred after the prosecutor asked the witness to assume the following facts: "You have a couple for whom there's been a history of domestic violence, and an incident occurs where the perpetrator makes a threat upon that person and then destroys some of his or her property. [¶] Assume the fact that at some point the victim in this case changes her mind, minimizes or recants some, if not all, of the facts. [¶] Assume for a moment that the victim takes every possible step at some point after the incident to make sure that either the charges are dropped or that nothing happened and that it was all that person's fault. [¶] ... Assume also from this set of facts that these people are not back together." Appellant's objections of "compound, lengthy, confusing, unintelligible" were overruled. Dr. Baca then was asked if these facts were consistent with someone who was battered and suffered the effects of battering, and consistent with a victim in a cycle of violence. She answered each question in the affirmative.
Dr. Baca was the final prosecution witness in its case-in-chief. The People rested.

Defense Case

1. Kimberly Brown.
The first witness for appellant was Kimberly Brown, appellant's teenage daughter. She testified that on June 15, 1999, she heard Monique yelling and cursing at appellant. Kimberly went upstairs and looked out the window. From the window she observed appellant walking into the garage and Monique walking down the driveway with her dog. Kimberly next heard appellant talking to himself and glass breaking. She stated that Monique had lived with appellant and her for approximately five years, and during that time she had never seen Monique with a black eye or choke marks on her neck. She testified that she had never seen appellant standing over Monique with a metal spear and that there were no metal spears in the house. She never saw appellant commit or threaten violence upon Monique, and never heard Monique complain of such violence or threats of violence.
On cross-examination, Kimberly described the specifications of the house, namely, the house is two stories with five bedrooms and has four different phone numbers and six telephones. She denied telling Detective McNeal that the argument began when Monique and appellant were each accusing the other of having an affair or that she saw Monique near the white Honda while appellant was smashing the windows.

2. Rudolph Johnson.
Rudolph Johnson was the second witness called by appellant. Johnson testified that he was the National Chief of Staff of the Ameri-Can Program across the United States, a personal assistant, and a consultant. He stated he was around Monique seven days a week, at least nine hours a day, for the past two years. He never saw Monique with a black eye or choke marks on her neck, and he never saw appellant commit or threaten violence upon Monique. He testified that he also never heard Monique complain of such violence or threats of violence.

3. Magdalena Monterroso.
Magdalena Monterroso was appellant's next witness. She testified she had been appellant's housekeeper for almost three years. Similar to the testimony of the previous witness, Rudolph Johnson, she stated that in all the time that she worked *758 in appellant's home, Monday through Friday, 8:30 a.m. to 5:00 p.m., she never saw Monique with a black eye or choke marks on her neck, and she never saw appellant commit or threaten violence upon Monique. She testified that she also never heard Monique complain of such violence or threats of violence.

4. Shirley Hughley.
Shirley Hughley testified that she met appellant about 16 years before through her husband, George Hughley, who was appellant's best friend for almost 40 years. She stated that approximately one year ago, she received a phone call from Monique informing her that she was at a neighbor's house. When Shirley arrived at the neighbor's house, Monique told her that she had a fight with appellant over the operation of Ameri-Can so she left appellant's home. Monique did not seem frightened or nervous, but rather angry at appellant. Monique then told Shirley that she wanted appellant to worry and asked if she could stay with Shirley and her husband.
In February 1999, Shirley's husband passed away. Since appellant was George's best friend, Shirley phoned appellant while he was filming a movie in Florida and informed him of George's passing. Appellant was in shock and began crying. Monique and appellant helped Shirley with funeral arrangements. After the services, although Shirley spoke with appellant on the phone frequently, she did not see appellant for approximately two months after George's death.

5. Duane Moody.
The next witness for appellant was Duane Moody, who testified that he was appellant's personal consultant and past student of the Ameri-Can Program. He stated that the program had rehabilitated him, and although he had led a life of crime in his earlier years, which included convictions for credit card fraud, giving false identification to a police officer, and perjury, he had been a law-abiding citizen since 1997.
Moody stated that on June 15, 1999, around 9:30 p.m., he spoke to appellant and Johnson near appellant's house. After their conversation, Moody went into the house and saw Monique with Officer Janecek and another officer. Monique left and went to a local restaurant, International House of Pancakes, where she was met by Moody and Johnson. Moody and Monique left the restaurant and went to the Hollywood police station. Monique attempted to have the protective order removed and charges dropped against appellant, but she was unsuccessful on both matters. They then went to appellant's home, where appellant and Monique were reunited. Monique was happy to see appellant, and she and appellant kissed and hugged.
On cross-examination, Moody stated that he had acted as a messenger many times in the past for appellant's counsel, picking up and dropping off documents with prosecutors, but had not before that day ever told the prosecutors about the events he observed on June 15. He acknowledged that he had sustained 25 criminal convictions in the past, including burglary in 1977 and 1985, robbery in 1978 and 1979, aggravated assault in 1978 and 1979, brandishing a firearm in 1983 and 1993, perjury in 1992, and providing false information to a police officer in 1994.

6. Helene McDonald.
Helene McDonald, a medical doctor and licensed psychiatrist, was appellant's next trial witness. She testified that she conducted a psychiatric evaluation of Monique, which spanned 12 hours over the course of three days, and had reviewed *759 various items, including the 911 tape, appellant's interview with the police, certain medical records, the crime scene report, and follow-up reports by Gasparian and McNeal. Her conclusion was that Monique met the criteria for a borderline personality disorder. People suffering from this condition cannot tolerate being alone, rejected, or abandoned. In relationships, they tend to continuously repeat a cycle of idealizing their mate, getting scared of intimacy, and then devaluing the person and rejecting him or her before being rejected first. Persons with borderline personality disorder have terrible mood swings and are irritable, impulsive, and lack reasoning and judgment when in an enraged state. Often they will take steps, sometimes unconsciously, to hurt or humiliate the man or woman in their lives because they fear abandonment.
McDonald stated that when appellant was grieving and withdrawn over the death of his friend, Monique felt abandoned and rejected. Monique told Mc-Donald that she invited Jack to go rollerblading to make appellant angry and jealous. Later she called 911 because she felt bad and wanted appellant to feel the way she did. She also told Mc-Donald that when appellant said he was going to break the car windows, she stated "go ahead," happy to finally get a reaction out of him. Later at the police station, Monique believed that appellant would certainly divorce her at this point, so she "created a scenario" to make it appear appellant had been abusive to her in the past. McDonald stated that, in her opinion, Monique's condition of borderline personality disorder had a very large and important impact on the events of June 15, and Monique was not faking a borderline personality disorder.
At the conclusion of McDonald's testimony, appellant rested.

Prosecution Rebuttal Case
Dennis McNeal testified that he spoke with Kimberly Brown on June 16 regarding the previous day's events. Kimberly told him that appellant and Monique were having an argument wherein each accused the other of having an affair. According to Kimberly, Monique stood in the doorway raising her voice against appellant, but appellant remained calm and told Monique to leave the house. Kimberly then saw appellant breaking out the car windows while he was speaking with a person standing next to the car and inside the garage, whom she thought was Monique.
This was the first and last witness in the prosecution's rebuttal case. Appellant did not put on a surrebuttal case, and thus the evidentiary portion of the case concluded at this point. The jury then went home for the day, while the court and counsel discussed jury instructions.

Discussion Re Jury Instructions
For the purpose of this appeal, the principal jury instruction discussed at this point was CALJIC No. 2.09. This instruction set forth the limited purpose of the officers' testimony that they found Monique's statements on June 15 to be credible, namely, the purpose was limited to show that the conduct of the officers was reasonable. Although appellant's counsel initially opposed the instruction, he stated that, after rereading and rethinking the matter, he believed that the instruction benefited the defense, and he requested that it be given to the jury.

Jury Instructions, Argument, Deliberations, and Verdict
On September 8, 1999, the court read several preliminary instructions before *760 counsel made their closing arguments. Among those given was the modified CALJIC No. 2.09. The court stated as follows:
"Certain evidence was admitted for a limited purpose. At the time this evidence was admitted, you were instructed that it could not be considered by you for any other purpose than the limited purpose for which it was admitted. Do not consider this evidence for any purpose except the limited purpose for which it was admitted.
"Officer Montes De Oca testified to the effect that he believed Monique Brown was credible when she spoke to Officer Montes De Oca on June 15. Officer Arellano testified to the effect that she believed Monique Brown was truthful when she spoke to Officer Arellano on June 15.
"This testimony was admitted for the limited purpose of considering whether the actions of the Los Angeles Police Department on June 15 were reasonable. Do not consider this evidence for any purpose except the limited purpose for which it was admitted. All other testimony of these two witnesses may be considered for all purposes."
Counsel then gave their closing arguments. The prosecutor restated the facts of the case, pointing out inconsistencies in Monique's testimony and discussing the officers' testimony. Explaining the purpose of the modified CALJIC No. 2.09 and the frame of mind of the officers in approaching the situation, the prosecutor stated:
"Officers Montes De Oca, Arellano, Janecek and Lieutenant Albanese all believed the victim to be credible and testified that the course of action and the precautions taken would have been the same for any suspect, any ordinary citizen under those circumstances, in that area, in that location.
"I want to refer your attention to CALJIC 2.09. It talks about the testimony of Lieutenant Albanese and also of other officers, and it was admitted for the purpose of showing you that the officers' conduct was absolutely reasonable on June 15, 1999."
During his closing argument, appellant's trial counsel discussed the reasons he believed Dr. Baca was inadequate and unpersuasive as an expert witness. He stated:
"They brought us Dr. Baca, an unlicensed doctor, who failed her examination, who said she was working up the courage to take her exam again, and that she doesn't read the research, she scans it.
"How would you like to go into surgery with a doctor who had no license, failed his exam and didn't read the material? I'd be really scared to do that. I wouldn't want to do it and I wouldn't put any faith in that doctor, and you shouldn't put any faith in Dr. Baca.
"She's also not really an expert witness and she's also really not a doctor. Sandra Baca gets 60 percent of her income from court referrals for her clinic and has testified 100 times in the last five years for the prosecution and five times for the defense."
The jury began deliberations on September 9, 1999, at 9:00 a.m. At approximately 3:30 p.m. on September 10, 1999, the jury returned with a verdict finding appellant not guilty of count I (terrorist threat) and guilty of count II (vandalism). Sentencing was scheduled for October 5, 1999.

Sentencing Proceedings
On October 1, 1999, appellant filed an objection to any probation conditions that the court might contemplate imposing pursuant *761 to section 1203.097,[2] contending that it would be contrary to the legislative intent of that statute. Appellant's argument was that probationary terms could not be of a mandatory nature where the violence was perpetrated against property and not a person. Appellant also argued that probationary terms would simply be inappropriate as to the vandalism conviction.
On October 5, 1999, appellant did not appear for sentencing; rather, his counsel appeared on his behalf under section 977, subdivision (a). The prosecution objected to appellant's absence, but was unable to provide the court with any legal authority that required appellant to be there. The court noted it had read the sentencing memorandum filed by appellant, as well as the one filed by the prosecution.
After hearing argument of counsel, the court addressed the issue of whether probationary terms were mandated under section 1203.097. It stated that although the answer was not completely clear, the court believed that probationary terms were not mandatory, but the court still had discretion thereunder to impose probationary terms, if it determined that the vandalism was a crime of domestic violence, and even if it did not make this determination, it had discretion to impose any reasonable terms. The prosecution also stated that appellant's driver's license had to be suspended for a year as a consequence of the vandalism conviction.
The court sentenced appellant to 36 months' summary probation on the following terms and conditions: (1) work 40 days for the "Hollywood Beautification Team" or, in the alternative, perform 400 hours of community service; (2) enroll in and complete a 12 month batterer's program; (3) comply with a modified protective order; (4) pay $1500 to a battered women's shelter; (5) the victim is to be notified; and (6) pay a $100 restitution fine and $200 to a domestic violence fund. Appellant's driver's license was also suspended for one year under the mandatory provisions of Vehicle Code section 13202.6, subdivision (a)-(1).[3]
*762 Additional sentencing proceedings took place on January 5, 2000. Appellant was represented by new counsel, who was seeking a resentencing. In an in-chambers conference prior to taking the bench, the court and counsel discussed sentencing issues that depended, in part, on whether appellant would accept or reject probationary terms. The court indicated that a maximum term of six months in jail was appropriate, and that the crime of vandalism by appellant in this case "was a crime of domestic violence in a lay person's sense, perhaps not in a mandatory probation sense, but it certainly was a crime of domestic violence."
In proceedings later that day in court, the trial judge noted, among other things, that it had not concluded that probationary terms were mandatory, but rather that they should be imposed because they were reasonably related to the crime and were appropriate under the circumstances. The court noted that appellant's actions constituted extreme violence in a domestic setting and were a consequence of a domestic dispute. Appellant's counsel responded that the sentence as previously given was "overkill."
Once the trial court indicated that it would impose domestic violence counseling as a mandatory probationary term, appellant's counsel stated that there was no need to discuss the other probationary terms. After appellant's rejection of probation, the court imposed the following sentence: six months in jail, a $100 restitution fine, and a suspension of his driver's license for one year.

Discussion

A. Although appellant contends Albanese testified that he found Monique to be credible, the record reveals he did not give any such testimony. As for Gasparian, appellant did not timely object to his testimony that he believed Monique, and thus waived any such objection as to him on appeal. As to such testimony by two other officers, it was properly allowed for a limited purpose, and the jury was given the appropriate limiting instruction.
Appellant contends in his opening brief that the court erred in permitting four different officers, Montes De Oca, Arellano, Albanese, and Gasparian, to testify that each found Monique credible on June 15. A review of the record, however, reflects that Albanese did not give any such testimony. As for Gasparian, there is no indication in the record that appellant objected to his testimony that he believed Monique on June 15. A decision or judgment based on the erroneous admission of evidence will not be reversed unless, among other things, "[t]here appears of record an objection ... to exclude or to strike the evidence that was timely made...." (Evid.Code, § 353, subd. (a); see also People v. Valdez (1997) 58 Cal. App.4th 494, 505, 68 Cal.Rptr.2d 135.) Thus, even if one assumed that the admission of the testimony on Monique's credibility by Gasparian were erroneous, appellant waived this issue on appeal as to him.[4]
As regards the testimony of Montes De Oca and Arellano, the record *763 reflects that such evidence was not admitted to show that Monique was telling the truth on June 15. Rather, it was admitted to show the reasonableness of the officers' conduct, based on their belief that she was credible. The limited purpose of this testimony was made very clear to the jury through the court's specific instruction that such testimony was to be considered only "for the limited purpose of considering whether the actions of the Los Angeles Police Department on June 15 were reasonable."
Evidence Code section 800, subdivisions (a) and (b), respectively, provide that a lay witness's opinion testimony may be admitted if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of [the witness's] testimony." "A lay witness may testify in the form of an opinion only when he cannot adequately describe his observations without using opinion wording." (People v. Sergill (1982) 138 Cal.App.3d 34, 40, 187 Cal.Rptr. 497.) The admission of a layperson's opinion testimony lies in the discretion of the trial court and will not be disturbed "`unless a clear abuse of discretion appears. [Citation.]'" (People v. Mixon (1982) 129 Cal.App.3d 118, 127, 180 Cal.Rptr. 772.) In this instance, the testimony of the officers that they believed Monique to be credible in her statements made on June 15 assisted the jury in understanding the actions of the police on that day. For example, when told by Monique that appellant had threatened to snap her neck and smashed the car windows in anger, the officers acted reasonably in transporting her to the police station for an interview and obtaining the issuance of a protective order. In light of appellant's theory that the police acted unreasonably and grossly overreacted to the situation on June 15, the fact that the officers believed Monique's statements about appellant's threats and aggressive behavior tended to justify the actions taken by them.
Appellant's reliance on Sergill is misplaced. In that case, the defendant was charged with orally copulating his niece. The first trial resulted in a mistrial, with a nine-to-three vote for acquittal. In the retrial, one officer, Anderson, was allowed to testify that he believed, in light of his experience as an officer investigating child abuse cases, that the child victim was credible. When defense counsel objected to such testimony from the officer, the trial judge vouched for Officer Anderson's credibility in front of the jury, stating: "`[T]his officer has had approximately seven years of experience, and has written, as I recall his testimony, something in the nature of a thousand or more reports, which indicates that he has had experience in taking witnesses' testimony, and I think the course of that he would be normally expected to judge whether a person, in his opinion, is telling the truth or not. I think that he's qualified to render his opinion in that regard.' " (People v. Sergill, supra, 138 Cal. App.3d at p. 38, 187 Cal.Rptr. 497.) A second officer was allowed to testify that the child had accused the defendant, that the officer always tried to arrive at the "truth," and the officer did obtain the "truth" from the child. (Ibid.) The appellate court reversed the conviction on the grounds that the officers were not qualified as experts, their testimony regarding the child's credibility was irrelevant, and the court's comment, along with the officers' testimony on the victim's credibility, was a "usurpation of the jury's function as fact finder." (Id. at p. 41, 187 Cal.Rptr. 497.)
Unlike Sergill, there were reasons in the instant discussed above, to allow the officers to testify that they found Monique credible when they spoke with her on June 15. Also, whereas in Sergill the trial court vouched for an officer's *764 testimony that the victim was credible, the court in this case specifically gave a limiting instruction. The jury obviously did not blindly accept and adopt the view that Monique was completely truthful or accurate in her comments to the officers on June 15, as evidenced by the not guilty verdict on the terrorist threat count. There is simply nothing in the record to indicate that the jury had any difficulty in following the trial court's limiting instruction, and in the absence of evidence to the contrary, we presume that it did so. (People v. Olguin (1994) 31 Cal.App.4th 1355, 1374, 37 Cal.Rptr.2d 596.)

B. Although appellant's specific objection before trial was that Dr. Baca had not interviewed Monique and was thus not qualified, appellant's "foundation" objection at trial was adequate to preserve the issue of Dr. Baca's expert qualifications on appeal. The trial court, however, properly overruled this objection.
Appellant contends that the trial court erred in permitting Dr. Baca to testify on the issue of battered woman syndrome because she was not qualified to testify as an expert on the subject. Appellant claims that "when a purported `expert' fails to pass an examination designed to test their knowledge, based on their training, skill and experience, they manifestly fail to possess such knowledge as would qualify them to offer an expert opinion in the field...." Respondent argues that appellant failed to properly object below and the issue is waived on appeal. Respondent further contends that, in any event, Dr. Baca was more than qualified to testify as an expert.
The first question presented is whether appellant timely lodged the proper objection or objections in the trial court to preserve this issue on appeal. In pretrial proceedings on August 23, 1999, the court asked appellant's counsel if he had any argument against the testimony of Dr. Baca. Counsel and the court then engaged in the following exchange:
Mr. Graysen: Yes, there is a defense argument against Dr. Baca. Of course battered wife's syndrome evidence is admissible. My questionmy objection is that it may be admissible if the proper foundation is laid, but it may not be relevant, necessarily. And since Dr. Baca has not examined Monique Brown, she'll basically be giving some academic information to the jury that it suppose the plaintiffthe people will then elicit some information from Mrs. Brown on the stand consistent with battered wife's syndrome, and then during the argument put them together.
It'syou know, it's good lawyering, but I'm wonderingwhat it really does is it makes Ms. Lee [prosecution counsel] a psychologist or a doctor, and I don't think it's fair to the defense to get around the fact that Ms. Bacathat Dr. Baca did not examine Monique and isn't diagnosing Monique. It's letting them get around that in a very clever way, but I don't think it's particularly fair.
The Court: It does seem, however, to be what the Legislature contemplated when it dealt with the Evidence Code section in that regard.
I think we do need to have a proper foundation, but I think the nature of battered wife's syndrome, to the extent I understand it, would be that the victim would never be willing to be interviewed by the expert, and therefore, you couldn't really have a situation in which the expert would say, "well, I've talked to her now for 22 hours and she's still reluctant to testify, so now, I conclude"
Mr. Graysen: Yes.
The Court: So, I think that's the nature of the situation. I think that's why *765 the legislation is as it is, or the Evidence Code is as it is. And so long as there is an appropriate foundation, which remains to be seen, it likely would be admissible.
Mr. Graysen: How would it be relevant if the expert is notwell, that's not then we have the problemwell, okay. I'll let it go. I'll just say that it's notfor the record, it's not relevant because there is no examination, and it's not appropriate for a lawyer to act as a doctor and to make the diagnosis to the jury.
THE COURT: Well, if Ms. Lee does that, then we'll deal with the issue.
Mr. Graysen: Well, she's a very bright lawyer.
The Court: But she's certainly allowed to tell what she thinks the evidence has shown and draw any reasonable inferences from that.
Mr. Graysen: Right.
As reflected in the foregoing colloquy, appellant's foundation objection, at least as articulated on August 23, 1999, was directed to the absence of a personal examination of Monique, not that Dr. Baca was unqualified to give expert testimony on the issue of battered woman syndrome. Immediately prior to Dr. Baca's taking the stand at trial, appellant did not offer any objections as to her lack of qualifications, or any other objection. When the witness, however, was asked if she was able to determine certain characteristics of victims as a class with regards to domestic violence, appellant's objection of "foundation" was overruled. We agree with appellant that this objection preserved for appeal the question of whether the witness was properly qualified as an expert.[5]
Evidence Code section 720, subdivision (a), states: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." "`The decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of the inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citations.]" (People v. Hernandez (1977) 70 Cal.App.3d 271, 280, 138 Cal.Rptr. 675.)
The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. (People v. Singh (1995) 37 Cal.App.4th 1343, 1377, 44 Cal.Rptr.2d 644.) This court may find error only if the witness "`clearly lacks qualification as an expert.'" (People v. Hogan (1982) 31 Cal.3d 815, 852, 183 Cal.Rptr. 817, 647 P.2d 93, original italics.) Whether a person qualifies as an expert in a particular case depends on the facts of that case and the witness's qualifications. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited. (People v. Kelly (1976) 17 Cal.3d 24, 39, 130 Cal.Rptr. 144, 549 P.2d 1240.)
The record in the instant case reveals that Dr. Baca had significant credentials *766 in the field of domestic violence. Although she had not obtained a clinical psychology license, Dr. Baca was a licensed marriage and family counselor who had dealt exclusively with domestic violence for the last 13 years, actively participated in four domestic violence organizations, and had previous direct contact with over 2,600 victims of domestic violence. Thus, the court was well within its discretion in determining that Dr. Baca had the requisite "special knowledge" and "experience" allowing her to testify as an expert witness. "Expertise, in other words, `is relative to the subject,' and is not subject to rigid classification according to formal education or certification." (People v. Ojeda (1990) 225 Cal.App.3d 404, 408, 275 Cal.Rptr. 472; see also 1 Witkin, Cal.Evidence (4th ed. 2000) Opinion Evidence, § 38, p. 570.) Once it is established that a witness has adequate credentials to qualify as an expert, then questions as to the degree of his or her expertise go to weight, not admissibility. (People v. James (1989) 208 Cal.App.3d 1155, 1164, 256 Cal.Rptr. 661.)
The trial court did not abuse its discretion in admitting Dr. Baca's testimony. There was more than an adequate basis for her qualification as an expert.

C. A trial court is allowed to review a police report in connection with a law and motion matter pursuant to section 1204.5. The absence of a cover affidavit in this case was a technical violation of the statute that did not prejudice appellant. Furthermore, appellant's lack of a contemporaneous objection waives the issue on appeal, and appellant has not demonstrated any prejudice whatsoever by the court's consideration of the police report.
Appellant next contends the trial court committed reversible error by reading the police report in violation of section 1204.5. This challenge is in reference to a statement made by the trial court on August 23, 1999, before the commencement of the evidentiary portion of the case. The court stated: "I've looked at the police report sometime in the past for other issues, but at this point, unless there's a motion pending, I'm not going to look at it, for obvious reasons."
Appellant's counsel did not object at this time, or at any other time before, during, or after trial, to the court's reading of any police report. Although the trial court did not identify the report in question, it most likely was a copy of Gasparian's report of his interview with Monique on June 15. Appellant filed a "Motion to Exclude Evidence of Defendant's Prior Bad Acts, Police Contacts or Arrests," to which the prosecutor filed a "Motion in Opposition to Motion to Exclude Evidence of Defendant's Prior Bad Acts, Etc.," on July 26, 1999. Attached to the latter was Gasparian's report of his interview with Monique.
Section 1204.5, subdivision (a), provides: "In any criminal action, after the filing of any complaint or other accusatory pleading and before a plea, finding, or verdict of guilty, no judge shall read or consider any written report of any law enforcement officer or witness to any offense, any information reflecting the arrest or conviction record of a defendant, or any affidavit or representation of any kind, verbal or written, without the defendant's consent given in open court, except as provided in the rules of evidence applicable at the trial, or as provided in affidavits in connection with the issuance of a warrant or the hearing of any law and motion matter, or in any application for an order fixing or changing bail, or a petition for a writ."
Section 1204.5 expressly provides that the trial court may read police *767 reports where provided in connection with a law and motion matter. In this instance, the report was provided by the prosecution in connection with a motion advanced by appellant, and opposed by the prosecution, to exclude evidence. Thus, the police report was submitted in connection with a type of proceeding specifically exempted by the statute. Although it is correct that respondent did not include a declaration by Gasparian or some other person regarding the report, the record does not reflect any objection by appellant on this or any other basis. Appellant's failure to make a contemporaneous objection waives the issue on appeal. (People v. Scott (1977) 15 Cal.4th 1188, 1207, 65 Cal. Rptr.2d 240, 939 P.2d 354.) If appellant had asserted a timely objection, the trial court would have been given an opportunity to make a complete record of the circumstances under which it read the report. Having failed to take the proper steps in the trial court, the issue cannot be raised for the first time at the appellate level. (Ibid.)
Finally, appellant has not shown any possible prejudice that may have resulted from the court's reading of the report. In the absence of any such showing, this contention must fail. "To justify a mistrial, or a new trial, or a reversal on appeal, an affirmative showing of prejudice is required. [Citations.]" (People v. Beaumaster (1971) 17 Cal.App.3d 996, 1009, 95 Cal.Rptr. 360.)

D. The principal probationary terms imposed by the trial court and challenged by appellant on appeal were mandatory. Furthermore, even if they were not, the court was well within its discretion to impose them, as well as the remainder of the probationary terms.
Appellant contends that during the initial sentencing, the trial court abused its discretion by imposing "unauthorized" and "illegal" probationary terms. The challenged terms consist of: (1) attendance at a 12 month domestic violence counseling program; (2) payment of a $200 domestic violence fine; and (3) payment of $1,500 to a battered women's shelter. Section 1203.097, subdivision (a), provides that where the victim is a person defined in section 6211 of the Family Code, the terms of probation shall include a minimum or $200 payment and successful completion of a domestic violence counseling program. (Pen.Code, § 1203.097, subd. (a)(5) & (6), respectively.) The court also has discretion under section 1203.097, subdivision (a), to impose a payment of up to $5000 to a battered women's shelter. (Pen.Code, § 1203.097, subd. (a)(11)(A).) Appellant acknowledges that Monique is one of the class of persons defined in Family Code section 6211, which provides in relevant part that "`Domestic violence' is abuse perpetrated against any of the following persons: [¶] (a) A spouse...." Appellant argues, however, that Monique was not the victim of the vandalism count; rather, the car was the victim. Therefore, according to appellant, the domestic violence probationary terms set forth in section 1203.097, subdivision (a)(5) and (6), were not mandatory, and since the vandalism was unrelated to domestic violence, any domestic violence probationary conditions were unreasonable and not within the court's sentencing discretion.
The trial court apparently gave some credence to appellant's "the car is the victim" contention and concluded domestic violence conditions were not mandatory, but rather only discretionary. We conclude, however, that the $200 payment and domestic violence counseling were mandatory probationary terms in this *768 case.[6] The position that the car was the victim, rather than appellant's wife, is inconsistent with common sense, as well as the language and purpose of the relevant statutes. No one would reasonably contend, for example, that if a person steals a wallet off a table, the wallet is the victim, not the owner of the wallet.
Even if appellant's version of the facts were accepted as true, appellant smashed out most of the windows in the car immediately after a domestic argument because he was "frustrated," and his wife was walking away at the time and heard the sound of glass breaking. The only reasonable inference from this evidence is that appellant's wife was a victim of the vandalism in a domestic violence setting.
Even if the provisions were not mandatory, they were clearly within the court's discretion. The discretion of a trial court to determine probationary terms is set forth in section 1203.1.[7] This section requires that "probation conditions which regulate conduct `not itself criminal' must be `reasonably related to the crime of which the defendant was convicted or to future criminality.' [Citation.] As with any exercise of discretion, the sentencing court violates this standard when its determination is arbitrary or capricious or `"exceeds the bounds of reason, all of the circumstances being considered."' [Citations.]" (People v. Welch (1993) 5 Cal.4th 228, 233-234, 19 Cal. Rptr.2d 520, 851 P.2d 802.) The assertion that improper conditions of probation were imposed is reviewed under a highly deferential standard"`[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, `[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]'" (People v. Superior Court (Alvarez) (1997) 14 Cal.4th 968, 977-978, 60 Cal.Rptr.2d 93, 928 P.2d 1171.)
In summary, we conclude that the probationary terms requiring the $200 payment and attendance at domestic violence counseling were mandatory. Even if not mandatory, these provisions, as well as the other probationary terms, were well within the court's discretion.

E. Appellant's driving privileges were properly suspended for one year. The statute is constitutional on its face and as applied to appellant.
Appellant argues that the suspension of his driving privileges for one year under *769 Vehicle Code section 13202.6, subdivision (a)(1), was unconstitutional, as well as irrational and inappropriate under the circumstances of the case. We conclude these arguments lack merit, that the statute passes constitutional muster, and that the suspension was legally proper.
Vehicle Code section 13202.6, subdivision (a)(1), provides in relevant part that: "For every conviction of a person for a violation of Section 594 [vandalism] ... of the Penal Code, committed while the person was 13 years of age or older, the court shall suspend the person's driving privilege for one year, except when the court finds that a personal or family hardship exists that requires the person to have a driver's license for his or her own, or a member of his or her family's, employment or medically related purposes." It is established that the right to drive is not a fundamental right, but a privilege subject to regulation. (Tolces v. Trask (1999) 76 Cal.App.4th 285, 290, 90 Cal. Rptr.2d 294.) "When called upon to evaluate a substantive due process challenge to a legislative police power measure that does not impinge upon fundamental rights, constitutional principles require the reviewing court to apply the rational basis test." (Perkey v. Department of Motor Vehicles (1986) 42 Cal.3d 185, 189, 228 Cal.Rptr. 169, 721 P.2d 50.) The standard to be applied in determining whether the challenged provision comports with the requirements of due process has been stated as follows: "`In the exercise of its police power a Legislature does not violate due process so long as an enactment is procedurally fair and reasonably related to a proper legislative goal. The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute.'" (People v. Kilborn (1996) 41 Cal.App.4th 1325, 1329, 49 Cal.Rptr.2d 152, quoting from Hale v. Morgan (1978) 22 Cal.3d 388, 398, 149 Cal.Rptr. 375, 584 P.2d 512.) The burden of demonstrating the constitutional infirmity of the statute lies with the challenger. (People v. Rodriguez (1998) 66 Cal.App.4th, 157, 176, 77 Cal.Rptr.2d 676.)
The Legislature originally adopted Vehicle Code section 13202.6 for the purpose of deterring youths convicted of a particular form of vandalism (tagging), but it was thereafter amended to include defendants who are convicted of any form of vandalism. (Stats.1990, ch. 712, § 1, pp. 3314-3315; Stats.1994, ch. 909, § 9.) Appellant argues that by enacting Vehicle Code section 13202.6, "the Legislature simply cast a net which included some (although perhaps very few) instances of vandalism with respect to which a loss of the driving privilege is totally irrational, and thus a violation of the due process `rational basis' test for upholding the constitutionality of a penal statute."
As case authority confirms, however, the Legislature is not required to draft the most narrowly tailored statute to withstand a "rational basis" analysis. So long as the purpose of the statute is reasonably related to a proper legislative goal, the statute passes the rational basis test. The statutory provision requiring appellant to forgo his driving privileges for one year bears a reasonable and rational relationship to the goal of deterring vandalism. There is a certain logic in depriving a person of the use of his or her car where that person has maliciously damaged the car of another. The statute is clearly constitutional on its face and as applied to appellant.

*770 F. There is no evidence that the six-month sentence was imposed as a "punishment" for appellant's rejection of probation. The court was within its discretion to impose the maximum custody sentence in this case.
Finally, appellant contends that the trial court abused its discretion in imposing the maximum custody term of six months as "punishment" for his rejection of probation. It is settled that a criminal defendant has the right to refuse probation and undergo a sentence. (People v. Balestra (1999) 76 Cal.App.4th 57, 69, 90 Cal. Rptr.2d 77.) "Whether the trial court determines to impose [certain conditions] is ... within its sound discretion and, if it does, the defendant must either submit to the condition or, if [he] considers the condition 'more harsh than the sentence the court would otherwise impose, [exercise] the right to refuse probation and undergo the sentence.' [Citations.]" (People v. Beal (1997) 60 Cal.App.4th 84, 87, 70 Cal. Rptr.2d 80.) "[A] reviewing court should not disturb the exercise of a trial court's discretion unless it appears that there has been a miscarriage of justice.... `It is fairly deducible from the cases that one of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. [Citations.] Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' [Citations.]" (Denham v. Superior Court (1970) 2 Cal.3d 557, 566, 86 Cal.Rptr. 65, 468 P.2d 193.)
Upon review of the record, it is clear that the trial court considered appellant's crime to be serious, in light of the evidence at trial, and one deserving of six months in jail. On January 5, 2000, counsel and the court had an in-chambers conference that was reported. When asked by appellant's counsel how much time appellant would receive if he rejected probation, and immediately after the prosecutor interjected that she would request the maximum sentence, the court stated: "Long before I heard the people's recommendation, long before anything came up in this case, after I heard the evidence, that was what I concluded an appropriate nonprobationary sentence would be...."
Thus, the court had previously determined, after viewing the evidence and before appellant's possible rejection of probation ever came up, that six months in jail was appropriate. In later proceedings that day in open court, the court spoke further on the issue of an appropriate sentence, as follows:
"It's difficult for me to evaluate how to sentence a defendant who does refuse to accept probation. The first consideration is the nature of the crimes, and although the defense has repeatedly minimized this particular crime of vandalism as compared to others, in fact the contrary is true.
"I have not seen a crime of vandalism which compared to this. As I indicated, most crimes of vandalism are more properly described as malicious mischief, young people spray painting on a wall. This is a crime of extreme violence. In most cases, the monetary damage is minimal.
"There was a tremendous degree of violence involved, as I said. The crime was committed whether with rage, or mere frustration as Mr. Brown said, in my view, with the intent to have an impact *771 on the victim. I don't know how anyone could conclude otherwise. It's beyond the mere property damage which occurred and which apparently was quickly fixed.
"There's also been a lack of acknowledgement that the conduct was even wrong. I mean we repeatedly hear that it was in a garage and nobody saw it and there wasn't really a victim and it was only a broken window and it was either his anyway or theirs or Mrs. Brown consented.
"That after the fact Mr. Graysen argued to me that Mr. Brown recognized he was angry and should have stepped back does not change the situation.
"The fact that Mr. Brown is refusing to accept help with the anger and violence which was my much-preferred approach to this case only indicates to me the necessity for a significant punishment."
As the record reflects, the trial court did not impose a retaliatory sentence, but rather analyzed the necessary factors in determining the appropriate sentence to carry out its objectives. These factors include "`the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.'" (People v. Superior Court (Alvarez), supra, 14 Cal.4th at p. 978, 60 Cal.Rptr.2d 93, 928 P.2d 1171.) The custody sentence by the trial court was manifestly not an abuse of discretion.
The judgment and sentence are affirmed.
We concur. BEVERLY, P.J., and KRIEGLER, J.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] The relevant portions of section 1203.097 provide as follows:

"(a) If a person is granted probation for a crime in which the victim is a person defined in Section 6211 of the Family Code, the terms of probation shall include all of the following:
"(1) A minimum period of probation of 36 months, which may include a period of summary probation as appropriate.
"(2) A criminal court protective order protecting the victim from further acts of violence, threats, stalking, sexual abuse, and harassment, and, if appropriate, containing residence exclusion or stay-away conditions.
"(3) Notice to the victim of the disposition of the case.
"(4) Booking the defendant within one week of sentencing if the defendant has not already been booked.
"(5) A minimum payment by the defendant of two-hundred-dollars ($200) be disbursed as specified in this paragraph. If, after a hearing in court on the record, the court finds that the defendant does not have the ability to pay, the court may reduce or waive this fee. [¶] ... [¶]
"(6) Successful completion of a batterer's program, as defined in subdivision (c), or if none is available, another appropriate counseling program designated by the court, for a period not less than one year with periodic progress reports by the program to the court every three months or less and weekly sessions of a minimum of two hours class time duration. [¶] . . . [¶]
"(11) The conditions of probation may include, in lieu of a fine, but not in lieu of the fund payment required under paragraph (5), one or more of the following requirements:
"(A) That the defendant make payments to a battered women's shelter, up to a maximum of five thousand dollars ($5,000)."
[3] Vehicle Code section 13202.6, subdivision (a)(1), states'. "For every conviction of a person for a violation of Section 594 [vandalism] ... of the Penal Code, committed while the person was 13 years of age or older, the court shall suspend the person's driving privilege for one year...."
[4] As noted further in the discussion, however, we conclude that it was permissible for the officers to testify that they found Monique credible on June 15, and therefore any objection to such testimony by Gasparian, if it had been made, would have been properly overruled by the trial court.
[5] The only other pertinent objection made by appellant's counsel during Dr. Baca's testimony was after the prosecutor asked the witness to assume several facts in connection with a hypothetical question. Appellant's objections of "compound, lengthy, confusing, unintelligible" were overruled. An objection on the grounds of foundation was not asserted. We conclude, however, as noted above, that the issue was preserved on appeal by counsel's previous foundation objection.
[6] Family Code section 6203 defines "abuse" in relevant part as "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320." (Fam.Code, § 6203, subd. (d).) Family Code section 6320 provides in relevant part that "[t]he court may issue an ex parte order enjoining a party from molesting, attacking, striking, . . . destroying personal property ... of the other party. (Italics added.) Thus, appellant's vandalism of his wife's car was "abuse" in a "domestic violence" context.
[7] Section 1203.1 states: "(a) The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence ....[¶] ... [¶] (j) The court may impose and require ... reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer . . . ."