Filed 5/17/16  In re S.V. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.V., a Person Coming Under the Juvenile Court Law. | H041274 (Santa Clara County Super. Ct. No. JV40576) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>S.V.,<br><br>        Defendant and Appellant. | |

Minor appeals from a July 21, 2014 dispositional order in which the juvenile court found that she committed a battery pursuant to Penal Code sections 242 and 243, subdivision (a).  The juvenile court declared minor a ward of the court and returned her to the custody of her parents on probation.

At the contested jurisdictional hearing, three individuals provided varying accounts of a fight between minor and her mother, leading to a 911 call and minor's arrest.  One of the officers responding to the call was City of San Jose Police Officer Tyler Moran.  Officer Moran testified at the hearing that based on his investigation when he and the other officers arrived, he determined that minor was the primary aggressor in the incident.  On appeal, minor contends that she was deprived of her Sixth Amendment right to effective assistance of counsel because her defense attorney failed to object to Officer Moran's testimony as inadmissible "vouching" opinion evidence, and the failure

was prejudicial because but for that testimony, minor would likely have received a more favorable finding by the trial court. For the reasons stated herein, we agree with minor that Officer Moran's "primary aggressor" testimony was inadmissible and sufficiently prejudicial to warrant reversal.

## I. STATEMENT OF FACTS

### A. PROCEDURAL HISTORY

On March 14, 2014, the Santa Clara County District Attorney's Office filed a petition in juvenile court pursuant to Welfare and Institutions Code section 602, alleging that minor committed a battery (Pen. Code, §§ 242, 243, subd. (a)). Minor denied the petition, and on June 30, 2014, the juvenile court held a contested jurisdictional hearing. Following the hearing, the juvenile court found the battery allegation was true and minor a ward under Welfare and Institutions Code section 602. On July 21, 2014, the juvenile court ordered her home on probation, adopting the recommendations of the probation department. Minor's probation conditions included community service hours and completion of a domestic violence program.

### B. FACTUAL BACKGROUND

The incident took place on February 7, 2014. Minor resided with her mother (mother), her aunt (aunt), her younger brother, and her aunt's boyfriend. Mother received a call from the police asking to pick up minor from police custody because minor had been cited for trespassing at a movie theater. Back at the house, mother and minor argued and became physically embroiled. Aunt called the police at mother's request.

### C. JURISDICTIONAL HEARING

The prosecution presented testimony from mother, aunt, and Officer Moran. Aunt testified first. Minor testified in her own defense.

#### 1. Testimony of Aunt

Aunt was in her bedroom when she heard mother and minor arguing. She ignored it at first, then opened her bedroom door. Aunt saw mother holding minor's purse.

2

Minor wanted the purse back and mother refused. Aunt heard minor saying "Give it back. Give it back." Aunt saw minor swinging her arms at her mother "maybe once or twice" while trying to grab the purse back. Aunt did not see everything because minor's back was to aunt as she was coming into the bedroom. Aunt stated, "They were in my sister's bedroom." Aunt walked away and returned to her room to check on her nephew. The arguing continued and aunt returned to see mother and minor wrestling on the bed and minor pulling on mother's hair. Mother bit minor "to get her off" and grabbed her by the arms "because she was trying to get her out of the house." Aunt later testified that she did not see mother bite minor, but heard minor say "Don't bite me." Aunt also saw the bite marks, and her sister later told her it was the only way she could get minor off of her. Aunt also remembered mother yelling at minor to "Get out. Get out of the house" and minor telling mother that she hated her. Aunt called the police when minor was pulling mother's hair—mother looked up "angry" and told aunt "call the fucking cops." Aunt described her recollection of the incident as "little pieces" and said she "didn't see the whole thing." Aunt called the police and went outside to open the gate for them. When she came back inside, minor and mother were in their separate bedrooms. Aunt could hear minor crying in her room. Aunt went to mother who was crying and breathing very heavily.

### 2. Testimony of Mother

Mother picked minor up after the call from the police and brought her home. Minor was carrying her brother's cell phone. Mother asked minor to give her the cell phone, but minor refused because she wanted to delete something first. Minor's brother came into the room and offered minor $5 to get the phone back. Minor gave her brother the phone. This upset mother who told minor she could not take money from her brother and needed to give it back. When minor refused, mother grabbed minor's purse from off of minor's bed and told her she could have it back when she gave the money back to her brother. Mother left minor's bedroom, and minor followed her.

In the hallway outside of minor's bedroom, minor tried to get the purse back and mother "was kind of holding it behind my back." Minor "was trying to reach behind me and then started shoving me against the wall in the hallway and pushed me." Mother grabbed minor by the arms and told her she needed to get out of the house; she tried pushing minor toward the front door. Minor became upset and "said I put my hands on her, and she ended up punching me in the eye." The fight continued to escalate with crying, yelling, and arguing "back and forth." Minor ran into mother's bedroom and grabbed her cell phone, which mother tried to grab back. Mother testified, "I believe at this point we ended up falling on the bed, kind of trying to wrestle over the phone, basically. And I ended up kind of on top of her, and she had me by the back of the hair, and I couldn't move. I couldn't get her to release me. [¶] . . . [¶] She had me by the back of my hair with the right hand and kind of swinging at me with the left. [¶] . . . [¶] I kept telling her to let go of me." Mother bit minor on the thumb, explaining "I purposely tried to not hurt her too much, but I was trying to get her to release me so I could get up. And she finally let go and got up." Regarding the 911 call, mother testified, "I freaked out a little bit, and I asked my sister to call 9-1-1." Minor retreated to her bedroom, but the arguing continued. "I was asking her to still leave the house, and she refused. At this point she—she was still trying to upset me and said—and showed me a tattoo that she had gotten on her neck the night before." However, minor did not at that point attempt to hit or push mother again.

Mother testified that she recalled the "major events, the basics of the argument" but not everything about "exactly where we were and how much swinging and screaming and yelling and all the words that were said . . . ." She described the major occurrences that evening as "[t]he punching, the screaming, the disrespectful behavior, grabbing me by the hair." She described her own behavior as trying to control the situation and trying to get minor out of the house before the altercation got physical. Mother conceded on cross-examination that the pushing in the hallway was "back and forth" and testified that

4

minor shoved her against the wall at least twice. Mother also stated that she grabbed minor by the arms to try to bring her down the hallway only after minor's pushing and shoving: "I didn't touch her prior to her pushing and shoving me."

### 3. Testimony of Officer Moran

Officer Moran and two other officers responded to the call at approximately 11:01 p.m. Officer Moran's first contact was with aunt, who told him that her sister had been hit by minor. Officer Moran took a statement from minor. The other officers took statements from aunt and mother. Officer Moran testified that after the statements were taken, he was made aware of what the statements contained. When asked by the prosecutor, "did you make a determination as to who was the primary aggressor in this instant?" Officer Moran said "Yes." He identified minor as the person he had determined was the primary aggressor. Minor's counsel did not object to any portion of Officer Moran's testimony and elected not to cross-examine the officer.

### 4. Testimony of Minor

Minor was 15 years old when she testified in her defense. She was out with friends that evening. When she came home she went to her room. Mother wanted her to return her brother's phone and she said she had to turn it on to delete the numbers and things she had saved in the phone. Her brother came into the room and gave her $5 for the phone; minor deleted the items and returned the phone to him. According to minor, she and mother were not arguing or yelling during that interaction.

The argument began when mother learned that minor had accepted the $5 from her brother. Mother took minor's purse and went into mother's bedroom, and minor followed. Mother and minor argued over the purse. Minor grabbed mother's cell phone and said "We can trade. I will give you your phone if you give me my purse." Mother tried to grab the phone from minor's hand. A physical altercation followed with the two rolling onto the bed and mother on top of minor so minor "started pulling her hair trying to get her off." Minor stated that mother was laying across her shoulders at that point and

5

bit her trying to get her to let go of the cell phone and of mother's hair. Minor "ended up letting go."

Minor returned to her room with her purse, which mother had set on the nightstand during the fight on the bed, and called a friend to tell her that her mom wanted her out of the house. Mother overheard the phone call and confronted minor. This resulted in a further argument in the hallway with mother and minor "screaming at each other back and forth." Mother was telling minor to get out of the house and minor was arguing she had nowhere to go. Mother began to push minor toward the front door at the end of the hallway and minor was refusing and trying to go back into her room. According to minor, mother put her hands on minor's neck and was gagging her. Minor warned her to let go or she would hit her. She testified, "I would never even think about putting hands on my mom, but I couldn't get her hands off of my neck. I didn't try my hardest, but I hit her enough to get her to let go of me." When asked how she remembers the gagging when nobody else testified to that, minor responded "[b]ecause I remember I just got my tattoo on my neck, and I didn't want her to touch it, and she was gonna, like, scratch it or anything. So that's when I had to get her off. And that's when I told her about it. I said, 'I have a tattoo on my neck.' It wasn't to make her more angry like she had said." Minor was "shocked" that she had hit her mom and did not remember what happened after that, other than mother let go and minor returned to her room where she was when the police arrived.

### 5. Prosecution Closing Statement

The prosecutor in closing focused on the elements of a simple battery, which occurred as mother testified "when [minor] pushed [mother] in the hallway over taking the purse, which is a reasonable form of discipline." The prosecutor argued that minor began pushing and shoving mother in the hallway and that aunt's testimony corroborated this because aunt testified that "when she first went out in the hallway, she saw [minor] swing once or twice," though she admitted she did not see any contact. The prosecutor

6

attributed the discrepancy between minor and mother's accounts to minor's clouded recollection of the facts and motive to lie: "her testimony is the one piece that doesn't match anyone else's." The prosecutor continued: "Because you've also heard from Officer Tyler Moran, and based on his investigation and when the other officers spoke to the witnesses, including [aunt] and [mother], it was determined that [minor] was the dominant aggressor, and she was subsequently arrested for a single battery."

### 6. Defense Closing Statement

The defense argued there were three versions of what took place that night, and contrary to the People's claim, aunt's testimony did not corroborate pushing and shoving in the hallway by minor. Aunt only testified to seeing minor swinging once or twice without making contact. Instead, the defense argued the first contact might have occurred in mother's bedroom after minor took mother's phone, but there the offensive touching was "mutual" and "mutually ar[o]se at a point where either it's uncertain how they escalated to that point . . . ." The defense also argued that minor's testimony that she hit mother in the hallway when mother was grabbing her neck was especially reliable because of the detail minor provided about her neck tattoo which she had gotten the night before.

### 7. Juvenile Court Findings

The juvenile court stated its finding of a misdemeanor battery: "[G]iven the evidence, based on the evidence, the court does find that the allegations in the petition have been proven, that it's been proven beyond a reasonable doubt. That is based on my consideration of the evidence and arguments of counsel."

## II. DISCUSSION

Minor contends that ineffective assistance of counsel prejudiced her defense because her counsel failed to object to Officer Moran's inadmissible "vouching" opinion testimony that minor was the primary aggressor in the incident. If Officer Moran's testimony had been properly excluded, minor argues that the prosecution's case would

7

have depended solely on the testimony of minor's mother in an otherwise close case. The People respond that minor fails to demonstrate prejudice from the officer's testimony, and the record does not disclose that defense counsel had no tactical purpose for failing to object to the testimony. The People also contend that any appeal based on Officer Moran's testimony is forfeited because there was no objection at trial.

## A. LEGAL STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

A counsel's failure to render " 'adequate legal assistance' " may deprive a criminal defendant of her constitutional right to a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Ibid.*) A defendant claiming ineffective assistance of counsel bears the burden to establish two components. (*Id.* at p. 687.) These are "[1] whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and [2] whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*); *Strickland*, *supra*, at p. 687.) We may dispose of an ineffectiveness claim if defendant fails to demonstrate prejudice without determining whether her trial counsel's performance was deficient. (*Strickland*, *supra*, at p. 697.)

Our review of a claim of ineffective assistance of counsel is highly deferential. (*Strickland*, *supra*, 466 U.S. at p. 689.) We indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance and can be explained as a matter of trial strategy. (*Ibid.*; *Carter*, *supra*, 30 Cal.4th at p. 1211.) We must reject a claim of ineffective assistance of counsel if we cannot discern from the record on appeal why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one, or unless there simply

could be no satisfactory explanation. (*Carter*, *supra*, at p. 1211; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) We therefore will reverse on this ground " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980; *People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

### B. FORFEITURE

Minor's counsel did not object in the juvenile court to Officer Moran's testimony that he determined minor to be the dominant aggressor. It is well established that "a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below." (*People v. Anderson* (2001) 25 Cal.4th 543, 586.) Thus, the failure to timely object to a witness's statement contemporaneous to the testimony waives the objection and forfeits on appeal any claim of error based on that evidence. (*People v. Houston* (2012) 54 Cal.4th 1186, 1213 [claim of improperly admitted evidence is forfeited because defendant did not object on that ground at trial]; Evid. Code, § 353, subd. (a).) However, courts generally permit a defendant to raise the "waived" issue for the first time on appeal in the context of an ineffective assistance of counsel claim. (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 581.) Because minor's claim for ineffective assistance of counsel rests on her counsel's failure to object to the primary aggressor testimony, we find minor has not forfeit the issue on appeal.

### C. PREJUDICE

Minor contends that Officer Moran's testimony tilted the balance from what essentially was a draw in evidence in a very close case. The People respond that the testimony in question was secondary and its admission not prejudicial because the evidence of a battery was overwhelming. Our careful review of the record leads us to agree with minor that but for Officer Moran's statement that minor was the primary aggressor, it is at least reasonably probable that the result would have been more

9

favorable to minor.  (*Strickland*, *supra*, 466 U.S. at p. 694; *People v. Zapien*, *supra*, 4 Cal.4th at p. 980.)

The juvenile court found the allegations in the petition proven beyond a reasonable doubt based on the evidence and arguments of counsel.  Minor argues that the prosecution chose to rely only on mother's testimony of minor pushing her in the hallway as the basis of the alleged battery, thereby avoiding the self-defense claim that would have arisen from all of the other interactions between minor and mother.  This is supported by the prosecutor's short closing statement, which referenced three times that minor "pushed" or was "pushing and shoving" mother in the hallway.  The prosecutor did not reference other behavior that could be considered "willful and unlawful use of force or violence upon the person of another" under Penal Code section 242, and argued that aunt's testimony that minor swung once or twice at mother, without making contact, was corroborative.  The prosecutor concluded her closing statement by repeating the testimony of Officer Moran and his determination that minor was the primary aggressor and was subsequently arrested for a single battery.

The People's contention that the evidence of a battery was "overwhelming" is not supported by the sum of evidence in the record.  (*Strickland*, *supra*, 466 U.S. at p. 695 [reviewing court must consider totality of the evidence before the judge or jury when deciding ineffective counsel claim].)  The People point to mother's testimony that minor pushed her into the wall and punched her in the eye, and aunt and minor's testimony that minor pulled mother's hair.  But to the extent the People's case rested on minor having pushed and shoved mother in the hallway while vying for the purse, the sole evidence offered was mother's testimony.  Aunt appears to have witnessed some or all of the same segment of the fight over minor's purse but did not see minor push mother in the hallway.  By aunt's testimony, the argument over the purse, which included minor swinging her arms at mother, took place in mother's bedroom.  This was consistent with minor's testimony that she followed mother into mother's bedroom while demanding her purse,

then grabbed mother's cell phone, precipitating the next sequence of fighting on mother's bed. Minor admitted to pulling mother's hair on the bed because "she was on top of me trying to grab her phone out of my right hand. . . . And I started pulling her hair trying to get her off of me." Mother's recollection of the hair pulling was consistent with minor's: "we ended up falling on the bed, kind of trying to wrestle over the phone, basically. And I ended up kind of on top of her, and she had me by the back of the hair, and I couldn't move."

As to minor having hit or punched mother in the eye, in minor's version this happened in the hallway when mother was trying to push minor down the hallway to the front door, and mother grabbed minor by the neck causing her to gag. Minor testified that she hit mother hard enough to get her to release her. Mother's testimony similarly reflected that she grabbed minor and was trying to push her toward the front door, at which point minor "refused, got upset, said I put my hands on her, and she ended up punching me in the eye." The only significant difference between these accounts was when in the sequence of events the punch in the eye took place—whether before or after the bedroom fight—but there is no dispute that it occurred as mother was grabbing minor's arms and trying to force her out of the house. The testimony of both mother and minor regarding minor's neck tattoo confirms that minor showed mother or told mother about the tattoo toward the end of the sequence of fighting, though the testimony again differs as to whether mother first caused minor to gag by grabbing her neck while she tried to push her down the hallway.

We find the totality of the evidence, before considering the testimony of Officer Moran, reveals a murky picture of when and how the first offensive touching began, and whether mother's testimony that minor pushed her against the wall in the hallway was supported by the evidence to find a battery beyond a reasonable doubt. "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. . . . [¶] . . . Some of the factual findings will have

11

been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." (*Strickland*, *supra*, 466 U.S. at pp. 695-696.) Officer Moran's testimony did not purport to establish outright that minor committed a battery; but his statement that the police deemed minor was the primary aggressor likely would have impacted any inferences the finder of fact drew from the evidence. This influence likely had more than "an isolated, trivial effect" because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (*Id*. at p. 696.) We find a reasonable probability that the testimony of mother, minor, and aunt, taken together and without any inference or suggestion from Officer Moran's testimony that minor was the instigator of the unwanted physical contact, would have caused reasonable doubt by the juvenile court respecting a use of force by minor upon mother that was both willful and unlawful. (Pen. Code, § 242.)

### D. ADMISSIBILITY OF THE TESTIMONY AND COUNSEL'S FAILURE TO OBJECT

We next consider whether Officer Moran's testimony was improper "vouching" as to the guilt of the defendant or the credibility of the witnesses, and whether defense counsel's failure to object rendered counsel's assistance deficient. Minor argues that because the police did not independently observe the fight, Officer Moran's testimony that the police determined minor was the primary aggressor constituted nothing more than vouching for the credibility of the reporting parties, mother and aunt. The People respond that the testimony did not "vouch" for the credibility of any witness and might have been admitted as expert or lay opinion, providing several reasonable tactical reasons that defense counsel may have chosen not to object to the testimony.

As a general rule, "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744

12

(*Melton*).) Our Supreme Court has explained that it is for "the fact finder, not the witnesses" to "draw the ultimate inferences from the evidence." (*Ibid*.) Although a lay witness may be permitted to express an ultimate opinion based on his perception, such opinion is limited to "where 'helpful to a clear understanding of his testimony' [citation], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." (*Ibid*., citing *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-40 (*Sergill*); Evid. Code, § 800, subd. (b).)

The state's high court in *Melton* thus considered whether the testimony of an investigator in a murder case was improper to the extent it indicated the investigator's assessment of a witnesses' credibility. (*Melton*, *supra*, 44 Cal.3d at pp. 744-745.) The investigator testified as a defense witness to conversations he had with one witness, Boyd, in which Boyd suggested that another man "Charles" was involved in the murder. (*Id*. at p. 742.) On cross examination, the investigator admitted he did not follow up on the "Charles" story, provoking objections by defense counsel. (*Ibid*.) On appeal, the defendant argued that "by revealing [the investigator]'s failure to pursue Boyd's information, the questions and answers disclosed [the investigator]'s inadmissible opinion that Boyd's statements about Charles were not worthy of belief." (*Id*. at p. 743.) The court agreed that insofar as "the principal purpose of the prosecutor's inquiry was to suggest simply that [the investigator] *did not believe* Boyd," and the jury later was invited to agree with that assessment, admission of the testimony was error. (*Id*. at p. 744.) The court explained that the record did not establish the investigator to be an expert on judging the truthfulness of informants in investigations, did not show that he knew anything about Boyd's reputation for veracity, and that his detailed description of the interviews with Boyd "le[ft] the factfinder free to decide Boyd's credibility for itself . . . ." (*Ibid*.)

*Melton* cited with approval an appellate court case, *Sergill*, *supra*, 138 Cal.App.3d at page 37, which reversed a sex offense conviction after the trial court permitted opinion

13

testimony by police officers as to the victim's credibility. The first police officer was allowed to testify over the defense counsel's objections that he had formed an opinion as to whether the victim was telling the truth, and that based on his experience in abuse investigations, he believed she was being truthful. (*Id*. at p. 38.) Overruling the objections, the trial court stated aloud before the jury that the officer had " 'approximately seven years of experience,' " had written " 'in the nature of a thousand or more reports,' " and through the course of taking witnesses' testimony " 'would be normally expected to judge whether a person, in his opinion, is telling the truth or not. I think that he's qualified to render his opinion in that regard.' " (*Ibid*.) A second officer also was allowed to testify that the officer believed the victim had told the truth based on the officer's questioning. (*Ibid*.) But the appellate court rejected the arguments that the evidence was competent expert or lay witness opinion testimony. (*Id*. at p. 39.) Because the officers did not know the child and were unaware of her reputation for honesty or dishonesty, they were not testifying to any aspect of her character. (*Ibid*.; Evid. Code, § 780, subd. (e).) Nor did the record establish that the veracity of those reporting crimes to the police was "a matter sufficiently beyond common experience to require the testimony of an expert," or that the officers were qualified to render such expert opinion. (*Sergill*, *supra*, at p. 39.) And because the "officers were able to describe their interviews with the girl in concrete detail," the court concluded "their opinions or conclusions as to her truthfulness were not 'helpful to a clear understanding of [their] testimony.' " (*Id*. at p. 40, quoting Evid. Code, § 800, subd. (b).)

The portion of Officer Moran's testimony at issue here is limited to the following exchange: "Q. (By [the prosecutor]) And after everybody's statements were taken were you made aware of what those statements contained? [¶] A. [Officer Moran] Yes. [¶] Q. So did you make a determination as to who was the primary aggressor in this instant? [¶] A. [Officer Moran] Yes. [¶] Q. What did you do next? [¶] A. I placed her in handcuffs and put her in my patrol car. [¶] Q. Who is the 'her' you're referring to? [¶] A. The

14

suspect, [minor]." Defense counsel did not object and did not cross-examine Officer Moran. As discussed above, the prosecutor's closing argument reiterated Officer Moran's conclusion that minor was the primary aggressor.

We find that Officer Moran's statement in response to the prosecutor's inquiry, though not directly vouching for the testimony of mother and aunt, had the equivalent effect. That is, it provided the basis for an inference that mother and aunt were to be believed because minor was the primary aggressor. In *Melton*, the investigator did not testify directly that he had not believed Boyd when Boyd told him another person was involved in the murder. (*Melton*, *supra*, 44 Cal.3d at p. 742.) Our high court nonetheless concluded that "[i]t seems, as defendant asserts, that the principal purpose of the prosecutor's inquiry was to suggest" that the investigator did not believe Boyd. (*Id*. at p. 744.) Similarly here, the purpose of inquiring whether Officer Moran made a determination as to who was the primary aggressor can only be understood as a means of bolstering mother and aunt's credibility, and by the same measure, minor's guilt.

The People do not urge, and the record does not reflect, any other purpose for the prosecutor's inquiry. For example, there was no issue before the court as to whether the arrest was properly made. By contrast, in *People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 33, the court rejected a defense argument based on *Sergill*, explaining that the officers' testimony that they believed the witness to be credible "assisted the jury in understanding the actions of the police on that day," including transporting the witness to the police station for an interview and seeking a protective order. In *People v. Brown*, the limited purpose of the testimony was further made clear by a specific instruction to the jury to that effect. (*Ibid*.)

We are not persuaded by the People's argument that defense counsel reasonably might have concluded that Officer Moran's statement was admissible as either expert or lay opinion, and did not object for that reason. In *Sergill*, the court concluded that even if the veracity of a reporting party was a proper subject for expert police testimony (it was

15

not), the record did not reflect that the testifying officers were qualified. (*Sergill*, *supra*, 138 Cal.App.3d at p. 39.) Here, the only information in the record regarding Officer Moran's qualifications was his testimony that he was a police officer with the City of San Jose for "[j]ust under two years." While a police officer arguably has "special knowledge, skill, experience, training, or education sufficient" to determine who is the aggressor in a physical altercation in order to make the appropriate arrest, nothing in the record establishes such expertise, nor Officer Moran's qualifications as an expert on this point. (Evid. Code, § 720, subd. (a).) The same is true for the argument that Officer Moran's statement might have been related to a subject "sufficiently beyond common experience" so that "the opinion of an expert would assist the trier of fact." (*Id*., § 801, subd. (a).) In the absence of any foundation laid to establish Officer Moran's expert qualifications to determine who was the primary aggressor based only on witness statements, defense counsel could not have reasonably concluded that his statement was admissible as expert opinion.

We also find that Officer Moran's testimony could not reasonably have been considered an admissible lay opinion because whether minor was the primary aggressor was akin to the ultimate inference to be drawn from the evidence, i.e., whether minor was culpable for initiating the offensive touching. To admit the lay person's opinion on such an inference invades the province of the judge or jury, because "the fact finder, not the witnesses, must draw the ultimate inferences from the evidence." (*Melton*, *supra*, 44 Cal.3d at p. 744.) The limited exceptions to this rule do not apply here. Officer Moran had not known any of the witnesses before responding to the 911 call and could not draw from prior knowledge of mother's, minor's, or aunt's characters for honesty or veracity. (See *Sergill*, *supra*, 138 Cal.App.3d at p. 39; Evid. Code, § 780, subd. (e).) Officer Moran's statement that he determined minor was the primary aggressor also was not " 'helpful to a clear understanding of his testimony' " based on an inability to convey "the concrete observations on which the opinion is based." (*Melton*, *supra*, at p. 744;

16

Evid. Code, § 800, subd. (b).)  There was no attempt by either side to question Officer Moran as to his observations when he arrived at the house after the fight.  The only statement of evidentiary substance in Officer Moran's brief testimony was his identification of minor as the primary aggressor.  Since he was not qualified as an expert to offer this opinion, and he had no concrete observations that would be clarified by offering the lay opinion, the testimony was inadmissible.

Having concluded that the testimony was tantamount to "vouching" and not admissible as either lay opinion or expert opinion, we consider whether the record on appeal "affirmatively discloses" there was no other rational tactical purpose for counsel's decision not to object.  (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 581.)  Absent that showing, we defer to counsel's reasonable tactical decisions and indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 394; *Carter*, *supra*, 30 Cal.4th at p. 1211.)  For this reason, our high court has described the burden of establishing ineffective assistance of counsel "difficult to carry on direct appeal." (*People v. Lucas* (1995) 12 Cal.4th 425, 437.)

The People contend that defense counsel may have reasonably decided not to object in order to avoid drawing attention to the testimony, citing *People v. Huggins* (2006) 38 Cal.4th 175, 252.  The challenged failure to object in that case was to certain remarks in the prosecutor's closing argument.  The court found the defendant did not meet his burden, because at least one " 'satisfactory explanation' " (*ibid.*) for counsel's failure to object was that the prosecutor told the jury at the outset to disregard anything he would later argue that was not supported by evidence, and "[d]efense counsel could reasonably have decided that the prosecutor's prefatory admonition amounted to a sufficient warning to the jury . . . that repeatedly objecting to specific remarks, even if successful, could draw more attention to their content than the jury would otherwise pay in light of the prosecutor's initial caveat." (*Id.* at pp. 252-253.)

17

This explanation, though usually applicable in light of the fact that "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502) does not pass muster here, where the record of testimony competing for the juvenile court's attention was extremely limited. As the prosecutor's closing argument to the juvenile court made clear, mother's testimony of being shoved in the hallway was the primary, if not the only, evidence that could lead the court to find the battery allegation in the petition to be true. The only evidence that the prosecutor suggested corroborated mother's version was aunt's testimony—which did not address any pushing—and Officer Moran's determination that minor was the primary aggressor. The significance of Officer Moran's statement, juxtaposed against the limited evidence upon which the juvenile court could find a battery, leads us to conclude that a desire not to draw attention could not reasonably serve as a satisfactory explanation for the failure to object. It similarly would not be reasonable for defense counsel to rely on the juvenile court to disregard the testimony, because sitting as trier of fact, the court could have considered any evidence admitted without objection and could have given that evidence "whatever weight the trier of fact sees fit to give it." (*People v. Huber* (1964) 225 Cal.App.2d 536, 544.)

### III. DISPOSITION

The dispositional order finding the facts alleged in the petition to be true is reversed, and the matter is remanded for a new jurisdictional hearing.

18

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Márquez, J.